UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
AMERICAN POSTAL WORKERS UNION,      )
AFL-CIO                             )
                                    )
        Plaintiff,                  )
                                    )
        v.                          )     Civil Action .1:06CV00726 (CKK)
                                    )
UNITED STATES POSTAL SERVICE,       )
                                    )
        Defendant                   )
_____)


**PLAINTIFF'S MEMORANDUM
IN OPPOSITION TO MOTION TO DISMISS AS MOOT**


<u>**Introduction**</u>

        This case is before the Court on defendant's Motion to Dismiss as Moot.

The temporary stay of discovery pending disposition of the Motion has postponed

five depositions that had been noticed by plaintiff, the American Postal Workers

Union, AFL-CIO (hereinafter "the APWU").[1]

        The APWU brought this action seeking a declaratory judgment that the

United States Postal Service (hereinafter "Postal Service") had violated Section

3661(b) of the Postal Reorganization Act by implementing a nationwide plan to

reorganize its mail processing network without first submitting it to the Postal

Rate Commission (hereinafter the "PRC") a reasonable time in advance of its

_____

1 As counsel for the APWU advised defendant's counsel, the APWU did not oppose the stay pending
disposition of this motion because defendant had stated its determination to move for a protective order.
On balance it seemed to plaintiff more considerate of the Court to pretermit3 that debate, which seemed
likely to raise esoteric issues of jurisdiction, by agreeing to a brief stay while the instant Motion is under
consideration.

implementation.[2]  The Complaint also requests preliminary and permanent injunctions prohibiting the Postal Service from implementing its Evolutionary Network Development program (hereinafter "END") in violation of Section 3661(b) of the Postal Reorganization Act.

The APWU has not filed a motion for an injunction in this case and has no present intention to do so.  It will seek instead a declaratory judgment that the Postal Service violated Section 3661(b) by implementing its program without submitting it to the PRC a reasonable time in advance as required by that statute, as alleged in the Complaint ¶ ¶ 27-29.  In addition, the APWU will seek leave to Supplement and Amend the Complaint in this case – supplementing the complaint by alleging recently-revealed facts related to the Postal Service's intention to go forward with a different network realignment plan, and amending the request for relief to seek a declaration that any revised network realignment plan must also be submitted to the PRC a reasonable time in advance of its implementation

The Postal Service now contends that, because the PRC has issued its recommendations concerning the Postal Service's END program, APWU's contention that the Postal Service violated Section 3661(b) by implementing its program too soon is moot.  We show below that this case is not moot because there is an actual case or controversy between the parties concerning the interpretation and application of Section 3661(b) of the PRA, and the Postal

---

2 Section 3661 of the Postal Reorganization Act (hereinafter "the Act")(39 U.S.C. § 3661) requires that "[w]hen the Postal Service determines that there should be a change in the nature of postal services which generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Rate Commission requesting an advisory opinion on the change."

Service's violation of Section 3661(b) is capable of repetition yet evading review. Furthermore, the Postal Service's current plans demonstrate a need for direction from the Court.

## I.     THE VIOLATIONS ALLEGED IN THIS CASE ARE CLEARLY ESTABLISHED ON THE RECORD BEFORE THE PRC

The Postal Service acknowledges in its Memorandum In Support Of Motion To Dismiss (hereinafter "Memorandum"), at 3, that in considering the instant motion "[t]he court must accept as true all of plaintiff's well-pled factual allegations and draw all reasonable inferences in favor of the plaintiff… ."

In this case, the facts supporting plaintiff's allegations are well-developed in the extensive record developed by the PRC.  The PRC provided a hearing on the record concerning the END program consistent with its obligations under the PRA.  That proceeding was initiated by a filing by the Postal Service on February 14, 2006, and culminated in the issuance of the PRC's Recommendations on December 19, 2006.[3]

### A.     Background – NIA Becomes END

To understand how the Postal Service violated Section 3661 by its implementation of END, and to understand the Postal Service's likely attempts to justify its actions, it is necessary to make a brief reference to the background of the END program.  Development of END began in 2001 as the Postal Service's

---

3 39 U.S.C. § 3661(C) provides:
> The Commission shall not issue its opinion…until an opportunity for a hearing on the record under sections 556 and 557 of Title 5 has been accorded… .  The opinion shall be in writing and shall include a certification by each Commissioner agreeing with the opinion that in his [or her] judgment the opinion **conforms to the policies established under this title.** [Emphasis added]

Network Integration Alignment (NIA) plan.[4]   One of the early discussions of network optimization was presented in the Postal Service's Strategic Transformation Plan dated April 2002.   That Plan explained (at 30) that the Postal Service had "initiated a network optimization effort…intended to develop the blueprint for future network operations management within the Postal Service."  That effort, which has continued since 2002, is now called END.

In 2004, the Postal Service's Annual Report described END as "one of the core sub-strategies in our Transformation Plan."  2004 Annual Report at 28.  As the Postal Service explained to the GAO, in a March 18, 2005, letter to GAO commenting on a draft GAO Report on Network Redesign:  "One of the key strategies of our *Transformation Plan* in the area of mail processing and transportation rationalization is an initiative we call "Evolutionary Network Development (END)."[5]  The letter also observed that AMP is "one of the tools we use to implement the goals of END."[6]

END, as presented to the PRC, contained four main components.  One component is the computer optimization model.  The optimization model produces one or more optimal national networks [7] and identifies facilities where a change would theoretically improve efficiency.  The identified facilities are also subjected to evaluation using a procedure called an Area Mail Processing (AMP) review.[8]   This process is used to study and implement realignment opportunities

---

4 Shah Testimony July 18, 2006, Tr. 2/191 lines 1-14.
5 GAO Report GAO-05-261 (April 8, 2004), at 83
6 The GAO Report did not use the terminology END, it referred to the program by its earlier term, the NIA. GAO-05-261 (April 8, 2004) *passim.*
7 USPS Witness Shah Response to Interrogatory OCA/USPS-T1-14, Tr. 2/94.
8 Id. Additional facilities may be recommended for AMP review by local and area management. USPS Witness Shah Response to Interrogatory APWU/USPS-T2-1(d), Tr. 2/353.

through the consolidation of mail processing facilities9 and relies on USPS AMP

Handbook PO-408.10  The proposed changes are also reviewed using another

part of the END computer model, called the simulation model, that "tests the

feasibility of the proposed network solution."11   Finally, as the Postal Service

also informed the PRC, a critical component of the END realignment initiative as

supposed to be the identification and creation of Regional Distribution Centers

(RDCs), which the Postal Service characterized as the "backbone" of the network

infrastructure.12  When the Postal Service activates an RDC as part of END, it is

required to utilize the RDC Activation Planning procedure as well as the RDC

Communications Plan.13

### B.  Postal Service Presentation To The PRC

Section 3661(b) of the PRA states

When the Postal Service determines that there should be a change in the
nature of postal services which will generally affect service on a
nationwide or substantially nationwide basis, it shall submit a proposal,
within a reasonable time prior to the effective date of such proposal, to the
Postal Rate Commission requesting an advisory opinion on the change.14

The "change in the nature of postal services" at issue in this case is the

consolidation and realignment of mail processing facilities and transportation

networks pursuant to the Postal Service's Evolutionary Network Development

(END) strategy.15

---

9  USPS-T-2, pg 1 lines 7-10.
10 USPS-LR-N2006-1/3.
11 Williams Testimony, July 18, 2006, Tr. 2/515 lines 12-23.
12 USPS-T-1, pg 11 lines 3-4.
13 USPS-LR-N2006-1/23.
14 39 U.S.C. § 3661(b).
15 USPS-T-1 p. 7 lines 5-12.

The Postal Service's submission to the PRC, in PRC Case No. N2006-1, was accompanied by the written testimony of Pranab M. Shah (USPS-T-1) and David E. Williams (USPS-T-2) as well as numerous library references. 16  Shah and Williams answered interrogatories submitted by the parties before the PRC and, following their interrogatory responses, were cross-examined on the record before the PRC.  The Postal Service also provided interrogatory answers in the PRC proceeding and responded to eight information requests by the Presiding Officer of the PRC.  Final briefs were submitted to the PRC on October 26, 2006; and the PRC issued its Recommendations on December 19, 2006.

Ten AMP decision packages accompanied the Postal Service's Request for an Advisory Opinion.17  These ten AMPs were selected from a list of approximately two dozen AMP studies that had been placed on hold pending the completion of the END models.  When the models were ready for use, the first suspended AMP studies were reviewed using the END models and then, after they proved to be consistent with those models, ten were selected for submission to the PRC.    Williams testimony on cross examination at 506-509.  Williams also testified that, "[a]fter evaluating the list, it was decided that we would only move forward with 10 that had no service standard downgrades."  Id. at 514-515. As USPS Williams described it (cross examination at 509):

> We had this existing list already and then we got the output of the END model in the fall of 2005.  And so at that point, we had this merging of the AMP process and the END process and that was really the start of that approach.

---

16 Excerpts from the testimony of Shah and Williams are submitted herewith as attachments to this Opposition.  The full record of the proceedings before the PRC is available at http://www.prc.gov/main.asp?Left=contents.asp&Right=home.asp.
17 See Library References USPS-LR-N2006-1/5 and USPS-LR-N2006-1/10.

**C. USPS Implemented Its Strategy Before Its Submission To The PRC**

The timing of the implementation of these ten AMPs is described in the PRC Recommendation, at 77: "In the summer of 2005, the Postal Service embarked on a coordinated review and implementation of 10 pending AMP consolidation proposals submitted by different Area Offices. This was intended to ensure that these AMPs would fit within the future network identified by the END models. USPS-T-2 at 8-9; Exhibit 7, at 8-9. These AMP reports were filed as USPS-LR-N2006-1/5.

Thus, USPS Witness Williams testified that the centrally directed system for realignment began in late 2005,[18] and the first 10 AMPS were run through the END models to validate their consistency with the future network.[19] On October 1, 2005 the Postal Service decided to implement the first 10 AMPs and to move forward on the next 41.[20] The majority, if not all, of these 10 AMPS have been implemented.[21]

In response to an interrogatory filed by the APWU (APWU/USPS-T2-3), the Postal Service acknowledged on May 8, 2005, that "[e]ight of the ten AMPs have been fully implemented" and implementation of the other two was underway.

Thus, by at least the fall of 2005 the END program was being used to direct network realignment. In October 2005, the Postal Service determined to

---

18 Id. at Tr. 2/508 lines 13-18.
19 Id. at Tr. 2/512 lines 7-18.
20 Williams Testimony July 18, 2006, Tr. 2/508 line 19, and 2/509 lines 6-23.
21 APWU/USPS-T2-3, Tr. 2/355.

move forward with the first ten AMPs screened through the END models.  By

May 8, 2006, eight of the ten had been fully implemented and two others were in

process.  Yet, the Postal Service submission to the PRC on February 14, 2006,

acknowledged that the PRC's rules require submission at least 90 days in

advance of implementation.  See, e.g., Initial Brief of the United States Postal

Service in Docket No. N2006-1, before the PRC, at 20.22   Thus, to comply with

section 3661(b) of the Act with regard to implementation of the first ten AMP

studies reviewed using the END optimization and simulation models, the Postal

Service was required to seek an advisory opinion from the PRC by the fall of

2005, at the latest.  The Postal Service did not do so and instead waited until

February 14, 2006, to file its Request.

## II.    THE POSTAL SERVICE HAS APPARENTLY DECIDED TO MODIFY ITS NETWORK PLAN SIGNIFICANTLY

Throughout its description of its network realignment strategy, the Postal

Service explained that a new type of transportation and processing hub called a

"Regional Distribution Center" would be a central element of its new network.

"RDCs" s, as these facilities would be called, we described repeatedly as the

"backbone" of the new system.   For example, USPS Witness Williams testified

before the PRC that  "[e]ssentially, the backbone of the network's infrastructure is

a Regional Distribution Center (RDC). (quoted in the PRC Advisory Opinion,  at

20 ¶ 4015, citing Tr. 2/251.  This was well-understood by the PRC, which

---

22 "The Postal Service regards its February 14, 2006, filing to be in compliance with the requirement in 39 U.S.C. § 3661(b) that such requests be filed a reasonable time before the scheduled implementation of the service changes in question.  Section 3661(b) is implemented by the Commission at 39 C.F.R. § 3001.72 to require that such requests 'shall be filed not less than 90 days in advance of the date on which the Postal Service proposes to make effective the change in the nature of postal services.'" Id. at 20.

observed in its Advisory Opinion that  "[a] key part of END is the activation of RDCs." Id. at 28 ¶ 4035.

Despite the emphasis placed on Regional Distribution Centers as part of its new network, however, it may be that the Postal Service will not include Regional Processing Centers as part of its network.  On December 11, 2006, during the pendency of N2006-1, the Association for Postal Commerce published on the internet a newsletter in which it reported on a meeting with top postal managers responsible for network realignment, Deputy Postmaster General Pat Donohoe and Senior Operations Vice President Bill Galligan. http://www.postcom.org/public/articles/2006articles/end.not.near.htm.   According to Postcom, Donohoe and Galligan stated that  "the plans and design for END really are undergoing re-evaluation" … and "the whole question as to whether mail processing facilities should be modeled around the regional processing center (RPC) concept needs to be re-looked at." [23]

This newsletter alerted the APWU to the possibility that the Postal Service was in the process of making a significant change in its network realignment program even as it was pending review by the PRC.  The APWU, therefore, noticed the deposition of Senior Operations Vice President Bill Galligan.  That deposition is one of the depositions postponed as a result of the Postal Service's motion to dismiss this case as moot.

## III.   THE DISPUTE BETWEEN THE PARTIES OVER THE ALLEGED VIOLATIONS OF 3661(b) IS NOT MOOT

From the above recitation, it is readily apparent that the APWU's

---

[23] The Postcom newsletter is Exhibit  10.

contention that implementation of the ten AMPs at issue here was in violation of Section 3661(b) will evade review if this case is deemed to be moot.  The dispute is also capable of repetition and is in fact likely to be repeated.  The Postal Service has been cavalier about its obligation to submit its plans to the PRC, delaying its submission to the PRC until after it had already decided to implement ten of the first AMPs vetted through the new system, and then implementing them without waiting for the minimum 90 days prescribed by the PRC's regulations.24  If the issuance of a PRC Advisory Opinion on the merits of a plan can moot any pending dispute about the timing of the submission of the plan to the PRC, then this issue will never be adjudicated.

Under these circumstances, this case is not moot because it is capable of repetition yet evading review.  See Weinstein v. Bradford, 423 U.S. 147, 96 S.Ct. 347 (1975)(the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and there was a reasonable expectation that the same complaining party would be subjected to the same action again); accord, British Caledonian Airways v. Bond, 665 F.,2d 1153 (D.C. Cir. 1981) see also Pharmachemie B.V. v. Barr Laboratories, Inc., 276 F.3d 627, 632 (D.C. Cir. 2002).

## IV.    CONCLUSION

For the reasons stated above, defendant's Motion to Dismiss as Moot

---

24 The Postcom article, albeit hearsay and not yet made the subject of stayed deposition testimony by Vice President Galligan, serves to illustrate the illusiveness of review as Postal Service plans change.  If Postcom was correct, it may be that the PRC was deliberating about a plan that had already been materially changed.  It may well be that the Postal Service is obligated to submit its changed plans to the PRC forthwith in order to permit a reasonable time for review before their implementation.

must be denied and the parties permitted a brief additional period of discovery

before the case is presented on cross motions for summary judgment.

Respectfully submitted,

Darryl J. Anderson
O'DONNELL, SCHWARTZ & ANDERSON, P.C.
1300 L Street, N.W.
Washington, DC 20005
(202) 898-1707
(202) 682-9276
Danderson@odsalaw.com