# OFFICIAL TRANSCRIPT OF PROCEEDINGS
# BEFORE THE
# POSTAL RATE COMMISSION

In the Matter of:          )
                           )  Docket No.  N2006-1
NETWORK REALIGNMENT (END)  )

VOLUME #2

Date:     July 18, 2006

Place:    Washington, D.C.

Pages:    25 through 553

## HERITAGE REPORTING CORPORATION
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005
(202) 628-4888

EXHIBIT

12

1          VICE CHAIRMAN TISDALE:  Any other additional

2   written cross-examination for Witness Williams?

3              (No verbal response.)

4          VICE CHAIRMAN TISDALE:  Then this begins the

5   -- this brings us to oral cross-examination and two

6   participants have requested oral cross-examination,

7   American Postal Workers Union, AFL-CIO, Mr. Anderson;

8   and the Office of the Consumer Advocate, Mr.

9   Richardson.  Is there any other participant, who wants

10  to cross-examine Witness Williams?

11             (No verbal response.)

12         VICE CHAIRMAN TISDALE:  Mr. Anderson, will

13  you, please, begin?

14         MR. ANDERSON:  Thank you, Mr. Presiding

15  Officer.

16                    CROSS-EXAMINATION

17         BY MR. ANDERSON:

18    Q    Mr. Williams, you're a manager of processing

19  operations, network operations management, as I

20  understand it.  Is that a correct title?

21    A    That's correct.

22    Q    Is that a line management operation, as

23  opposed to a staff job?

24    A    No, it is not a line management job.  It

25  is --

Heritage Reporting Corporation
(202) 628-4888

505

1     Q    Staff?

2     A    -- a functional staff.

3     Q    You're support staff, okay.  And how long

4    have you held that position again?

5     A    Since October of 2005.

6     Q    Before that, when were you manager of

7    processing and distribution center operations?

8     A    From January 2005 until October 2005.

9     Q    And when were you manager of systems

10   integration and support?

11    A    It was approximately September 2001 through

12   January 2005.

13    Q    And I assume those two previous positions

14   were also staff positions, is that correct?

15    A    That is correct.

16    Q    And did those positions also involve the

17   work -- or some of the work that you're doing now with

18   the AMP process?

19    A    The manager of processing and distribution

20   center operations did.

21    Q    So beginning in January 2005, you had that

22   responsibility?

23    A    Correct.

24    Q    And in contrast, what about the manager of

25   systems integration and support, what did you do in

1    that position?

2        A    That position was responsible for all new

3    equipment deployments, integrating new equipment

4    deployments with field operations, as well as

5    functional responsibility for our remote bar coding

6    system network.

7        Q    I inferred from your testimony, but I would

8    like you to confirm it for me, if I'm right or correct

9    me if I'm wrong, that the END model, from your

10   perspective, at least, had been completed by the

11   summer of 2005 and that what followed from the summer

12   of 2005 was work needed to use the AMP procedures with

13   the model, together with the model.  Is that a fair

14   characterization?

15       A    It was fall 2005.

16       Q    By the way, are you more comfortable saying

17   "A-M-P" or "AMP?"  How do you --

18       A    A-M-P.  I call it A-M-P, yes, sir.

19       Q    Okay.  So, now, can I refer you, please, to

20   APW-USPS-T2-66?  And, in particular, there's a passage

21   in your response in B, which makes reference to

22   headquarters deciding to adopt a centrally directed

23   approach to identify AMP opportunities in the future,

24   meaning identify future opportunities, which has now

25   occurred.

507

1          A     That is correct.

2          Q     Okay.  And so, by -- that answer was filed

3     June 1, 2006, is that correct?

4          A     That's correct.

5          Q     Okay.  So, that by June 1, 2006, there was a

6     centrally directed approach using the END model to

7     direct AMP work?

8          A     That's correct.

9          Q     Do you know how many AMP studies have been

10    directed through END?

11         A     Directed through END?

12         Q     Yes.  If you would like to refer to

13    something, why don't you let me know what you're

14    referring to, so I can look to?  Is that your list of

15    41 there?

16         A     This is the list of 41 in my testimony.

17         Q     That is T2 to your testimony, is that right?

18         A     That's correct.  I'm referring to that list.

19         Q     If you could give me a moment, please, and

20    let me refer to that?  Go ahead, sir.

21         A     There were a number of these AMPs that are

22    on this current list of 41 that were in the hopper, so

23    to speak, before the centrally directed approach

24    occurred.  So, it's very difficult to discern which

25    ones on this list were a result of that centrally

Heritage Reporting Corporation
(202) 628-4888

508

1    approach to AMP or the identification of AMP

2    opportunities, based on the output of the END model.

3    So, this list of 41 reflects a blended approach from

4    the list that had been developed over the course of

5    the years, approximately from about 2001 through the

6    time that we started initiating these AMPs.  So, I

7    don't have that direct number to how many of these

8    were centrally directed because of that.  But, there

9    are a number of these on there that were centrally

10   directed.  And a lot of those AMPs that were on the

11   list were consistent with the output of the END model.

12   So, it's a blended hybrid list.

13        Q    Let me back up one question.  I know by June

14   1st, when you filed your answer to T2-66, the centrally

15   directed process had been done.  I neglected to ask

16   you, can you put a date on when you first sort of

17   kicked off or implemented the centrally directed

18   system?

19        A    It was late 2005.

20        Q    Okay, thank you.  Now, looking at your list,

21   which is USPS-T2, it's attached to your testimony, I

22   see that the Newark PNDC is on there.  Was that one

23   that was centrally directed or was it otherwise?

24        A    I don't recall.

25        Q    Is there someway for us to find out?

Heritage Reporting Corporation
(202) 628-4888

1         A     I believe we could get that for you.

2               MR. ANDERSON:  Would you supplement your

3     answer, please, for that, I would ask?  Mr. Tidwell?

4     That's a yes, okay.

5               BY MR. ANDERSON:

6         Q     But, in any event, END was -- for those that

7     had been begun in the field prior to the END initiated

8     AMPs, they were -- once END was completed, as an

9     evaluative tool, they were then tested to see if they

10    were consistent with END, as I understand it?

11        A     That's correct.  It was a blended approach.

12    We had a list of approximately 30 or so, maybe a

13    little bit more, that we had at headquarters.  And we

14    had this iterative process going back and forth with

15    the area managers of then plant support and we were

16    asking them for their opportunities that they had

17    identified at the area and district levels.  So, we

18    were getting input up from the area.  We had this

19    existing list already and then we got the out put of

20    the END model in the fall of 2005.  And so at that

21    point, we had this merging of the AMP process and the

22    END process and that was really the start of that

23    approach.

24        Q     Would you, please, make reference to APW-

25    USPS-T2-1?  And part C of that interrogatory response,

510

1    you stated that seven of the 10 studies that were

2    presented to the Commission in this case --

3         A    I'm sorry, could you --

4         Q    I'm sorry?

5         A    I'm sorry, I'm not there.

6         Q    Okay, sorry.  I thought you were.

7         A    I was on the wrong one.  Okay, I'm sorry, I

8    got it.

9         Q    Okay.

10        A    T2-1, correct?

11        Q    The question was whether the 10 projects

12   that were used to test the internal administrative

13   processes were selected from that group.  And you said

14   from that 10, and you said that seven of the 10 --

15        A    Seven of the 10 selected from the original

16   group.  I believe there was 28, maybe -- I think it

17   was 28.

18        Q    If you would -- I believe it was 24.  Again,

19   consult to your answer to T2-1, answer A.

20        A    Two dozen, approximately.

21        Q    Well, you have 24 exactly listed there.

22   Would that have been correct at the time?

23        A    Approximately two dozen.

24        Q    Okay.  And seven of the 10 that were

25   presented to the Commission in this case came from

511

1    that list of 24?

2         A    Correct.

3         Q    And those were 24 that had been suspended.

4    They were in process, but they were suspended pending

5    the development of END?

6         A    Correct.

7         Q    Okay.  And do you recall where the other

8    three studies came from, how they were selected?

9         A    As I said, we had this process of

10   interaction between the areas, primarily with the

11   managers of end plant support and my office, and we

12   were soliciting their list of opportunities that we

13   could move forward to, if and when we decided to

14   restart.  And we had a list and I know that Olympia

15   was on that list around February of 2005.  Monmouth

16   came on that list, I believe, as a result of opening -

17   - reopening up Trenton, because of the closure with

18   anthrax and they viewed that as an opportunity capture

19   excess capacity, because they had been operating

20   without a plant in that area.

21             VICE CHAIRMAN TISDALE:  Excuse me, just a

22   minute, Mr. Williams.  I've been requested to ask you

23   to back up just a little bit from --

24             THE WITNESS:  Oh, I'm sorry.

25             VICE CHAIRMAN TISDALE:  -- the microphone.

1                    THE WITNESS:  I'm sorry.

2                    VICE CHAIRMAN TISDALE:  Thank you.

3                    THE WITNESS:  And the northwest Boston was

4      an addition, based on a request from the northeast

5      area to add that to the list.

6                    BY MR. ANDERSON:

7          Q    In part D of that same interrogatory

8      response, you were asked to provide the criteria for

9      selection of the 10 studies that were presented to the

10     Commission in this case.  You responded, "area

11     management proposed to headquarters AMP studies, which

12     meant the current and future network requirements to

13     proceed with."  So, the 10 that were submitted here

14     met the END criteria, as I understand the import of

15     that answer; is that right?

16         A    Yes.  After that list of 10 was put through

17     the process that Mr. Shah described and we validated

18     that it was consistent with the future, then --

19         Q    Okay.  What I'm groping for here a little

20     bit, Mr. Williams, is how you selected these 10, as

21     opposed to the other 17.  Presumably, the other 17

22     also met the END criteria or did they not?

23         A    I don't recall all 17.  I don't recall

24     viewing output for each of the 17, whether they were

25     consistent with the future model.  The original -- in

1    the summer of 2005, I believe it was either in May or

2    June, the Postal Service was in the process of

3    deploying bio-detection system units and ventilation

4    filtration system units, which were in response to the

5    anthrax attacks on our nation's network.  And so, we

6    were deploying this equipment to detect and to protect

7    bio-hazards in the mail stream.  These systems were

8    very expensive and the thought was that we have a list

9    of AMPs, are there any AMPs that we're considering

10    that are in the process or on the future deployment

11    list to receive that equipment and could we initiate

12    AMPs to avoid deploying that equipment.  That was the

13    initial thrust of the identification of the first 10.

14        Q    So, are you saying that the 10 that were

15    submitted to the Commission, were they earliest in the

16    pipeline?

17        A    I'm not sure -- when you say "pipeline,"

18    what are you talking about?  Let me -- in the summer

19    of 2006, there was a proposal to initiate, to restart

20    up the AMP process.

21        Q    Two-thousand-five, I think you mean.

22        A    Right, 2005, I'm sorry, 2005; summer of

23    2005, to restart it up, to avoid the very expensive

24    hardware and the response plan that would be put in

25    place in these communities.  And that was the first

514

1    start of lifting the AMP process, reopening it up.

2    And we had this list of approximately two dozen or so

3    AMPs on the list and we started to look through that

4    list for opportunities, where we could evaluate the

5    AMP, to see if it was feasible and to avoid that very

6    expensive deployment of that equipment.

7        Q    Do you know how many of the 10 fell into

8    that category?

9        A    I do not recall.

10       Q    Would it have been fewer --

11       A    They were not the same 10.

12       Q    Would it have been fewer than five of the 10

13   that were submitted to the Commission?

14       A    I couldn't give you a number.  I really -- I

15   don't know.

16       Q    Could it have been one?

17       A    There was at least one.

18       Q    At least one of the 10 submitted to the

19   Commission?

20       A    I believe there was -- I believe Waterbury,

21   I believe might have been one of them.  There were

22   maybe a couple.

23       Q    Can you recall what other criteria were used

24   to determine what 10 were submitted to the Commission?

25       A    After evaluating the list, it was decided

515

1    that we would only move forward with 10 that had no

2    service standard downgrades.

3        Q    Can you describe for us, for the Commission,

4    what END inputs are taken into account during the AMP

5    process?  If you may -- if you wish, look at APW-USP-

6    T2-12.

7        A    Okay.

8        Q    In part, your answer says that the END model

9    produces inputs that can be taken into account during

10   the AMP process.  Can you describe what the inputs

11   are?

12       A    That input was -- it's an opportunity list.

13   As we've centrally directed the approach, we've taken

14   the END output, based on three digit zip assignments

15   and where those zip assignments are assigned to a

16   local processing center or a destinating processing

17   center.  We use that output of the END model and

18   compare that with the current network.  And we

19   identified through exceptions which current facilities

20   that are processing either originating and/or

21   destinating volumes that are not planned for the

22   future and we've come up with our candidate list.  And

23   that's the input used in the AMP process.

24       Q    And then, likewise, when the AMP process is

25   concluded with a report to headquarters, that report

516

1      is then run through the simulation model, as I

2      understand it.

3          A    That's correct.  That's my understanding.

4      Mr. Shah's functional area is one of the cross

5      functional reviewers of the AMP packages.

6          Q    Can you tell us, by the word, this word

7      "cross functional," what that means?  What's a

8      function and can you give us -- and if you can, tell

9      us what they are or give us some examples.

10         A    We've got the manager of field budget, who

11     evaluates the work hours.

12         Q    Excuse me, sir, can I ask you what you're

13     looking at?

14         A    I'm looking at a draft copy that we send

15     proposals, a cover letter that we send the proposals

16     to this cross-functional team, and it's got --

17         Q    Okay.  That's the cover letter you send when

18     --

19         A    That I send.

20         Q    -- an AMP comes in from the field, you send

21     it to the field.  Good, thank you.  Go ahead.

22         A    Manager, contract administration; manager,

23     maintenance policies and programs; manager, integrated

24     network development; manager, field communications;

25     manager, operations requirements; manager -- the old

517

1   manager, PADC operations, now the manager of

2   processing center operations, one of my managers that

3   reports to me; manager, logistics; manager, operations

4   budget and performance management; organizational

5   design and management analyst; manager, government

6   liaison; manager, network modeling and development.

7         Q    Maybe it would have been easier to ask you,

8   who was left out.

9              MR. ANDERSON:  I'm sorry, I wonder whether

10  we -- Mr. Presiding Officer, I wonder whether we can

11  make an exhibit of this document, so that we can see

12  how these AMPs are transmitted to the cross-functional

13  evaluation team?

14             MR. TIDWELL:  We have no objection.

15             MR. ANDERSON:  I guess this would be APW --

16             VICE CHAIRMAN TISDALE:  Okay.  We can make

17  it APW Exhibit 2.

18                             (The document referred to was

19                              marked for identification as

20                              APW Exhibit 2.)

21             MR. ANDERSON:  Thank you, very much.  We'll

22  provide two copies to the court reporter.

23             VICE CHAIRMAN TISDALE:  Okay.

24             MR. ANDERSON:  Thank you.

25             (Pause.)

Heritage Reporting Corporation
(202) 628-4888

518

1          BY MR. ANDERSON:

2      Q    Sir, I want to make reference to your direct

3   testimony now and the list of 41 AMP projects that

4   were attachment T2 to that.  We've alluded to it

5   before.

6          Actually I'm not sure whether we need to

7   look at another interrogatory response or not for

8   this, but in response to another interrogatory you

9   stated that in addition to these 41 AMPs that were

10  begun, there were five additional AMPs begun in 2006.

11  Do you recall that?

12          MR. TIDWELL:  Counsel, it might help his

13  recollection if you cited the interrogatory.

14          MR. ANDERSON:  It's APW-USPS-T-2-1(f).

15          BY MR. ANDERSON:

16     Q    Do you remember that now, Mr. Williams?

17     A    Yes.

18     Q    So there were five in addition begun in

19  2006?

20     A    Correct.

21     Q    Thank you.

22          With reference to the Newark to DVD AMP that

23  we referred to a few moments ago and which you're

24  going to follow up on, it's my understanding that one

25  has been approved and is in the process of being

Heritage Reporting Corporation
(202) 628-4888

1    implemented.

2        A    It has been approved.  It is scheduled for

3    implementation in early 2007.

4        Q    That's when the movement of mail has been

5    scheduled?

6        A    Correct.

7        Q    We don't know for sure, you're going to

8    confirm for us whether this one was initiated through

9    END.  It's possible that this is the first one

10   initiated through END to go forward, but we don't

11   know.

12       A    We don't know.  I'll follow up.

13       Q    Not at this moment.

14            It's my understanding that the Postal

15   Service had decided not to implement five of those 41

16   AMPs on this list.  That was appended to your

17   testimony.  Are you familiar with that fact?

18       A    I believe there are six of them.

19       Q    Okay.  I have Burlington, Plattsburgh,

20   Portsmouth, Springfield, and Utica.

21       A    And I believe there is Glenwood Springs,

22   Colorado to Grand Junction, Colorado.

23       Q    We had asked in interrogatories that you

24   produce the completed AMP studies from the five

25   locations that I was already aware of but we were

1 informed that the studies had not been completed but

2 they had been terminated, so the Postal Service on

3 that basis as I understand it, did not provide us any

4 documentation.

5    I'm having some trouble understanding the

6 difference between being completed and being

7 terminated.

8    The Postal Service has advised us that the

9 studies were terminated after concerns about the

10 feasibility of the proposals was communicated to

11 headquarters and a consensus was reached that these

12 proposals should not continue at this time.

13    That sounds to me like a description of what

14 happens when management decides after studying

15 something through an AMP that it shouldn't go forward.

16 What's the distinction between a negative

17 recommendation and a termination?

18  A The area office decided to terminate the AMP

19 and those AMP proposals never made it up to the

20 headquarters level.

21  Q Can you advise me whether or not the AMP

22 worksheets would have been completed on those studies?

23  A I have not seen those worksheets.  They were

24 never submitted to headquarters.

25  Q Was your office advised by the Area Vice

1    Presidents where in the process the AMP studies were

2    when they decided not to go forward?

3        A    I had a conversation with the Area Manager

4    in plant support of the northeast area and she

5    described the circumstances around each one of those

6    AMPs and the reasons why they were not moving forward.

7    I did not have a conversation with her about where in

8    the process those AMPs stood, whether it was at the

9    district level or at the area level.

10       Q    Do you recall today what the reasons were?

11       A    There was a concern about having mail,

12   overnight mail, ten capability of having overnight

13   mail being turned around and maintain the service

14   standards for that local area.

15            There was a concern in one of the facilities

16   about the management stability, they were having some

17   issues with management at the receiving plant and they

18   wanted to hold off.

19            There was a concern with the Springfield

20   into Hartford about the very complex service standard,

21   complexities around service standards and they didn't

22   feel like that could work from a service standards

23   standpoint.

24            Then the Utica to Syracuse, they were moving

25   forward with two other AMPs that were moving mail into

522

1    Syracuse and they felt that a third one could not at

2    this time be feasible because they were concerned

3    about introducing too much change into Syracuse so

4    they wanted to hold off on that one.

5          And there was one issue with capacity in the

6    gaining facility.

7          MR. ANDERSON:  Mr. Presiding Officer, I

8    would ask that the Postal Service produce all the

9    documentation on these six AMPs that were

10   discontinued, or terminated at the regional or

11   district level insofar as any documentation that would

12   have been included in an AMP report to headquarters

13   has been completed and used by district or Area

14   Managers to decide to terminate those studies.  I

15   would ask that the Postal Service produce those

16   documents.

17         The witness has testified that some of them

18   were terminated because of transportation concerns,

19   some of them were terminated because of service

20   concerns, and some of them were terminated because of

21   capacity concerns, so it seems clear that this

22   documentation may well provide some insight into the

23   impact of this whole process on the mail processing

24   service in particular, impact of the END AMP process.

25         So while we don't know exactly what it's

523

1    going to show, obviously, until we look at it, it

2    seems clearly relevant and I would ask that it be

3    produced.

4         MR. TIDWELL:  There is presently pending an

5    APW interrogatory to which the Postal Service intends

6    to respond by motion practice requesting the same

7    documents.

8         As I understand your request you're asking

9    for documents that would support the recommendations

10   made by the area to headquarters.

11        MR. ANDERSON:  I'm trying to be even more

12   specific than I was I think in our pending motion,

13   saying that in the six AMPs that have been described

14   here by the witness as having been terminated, that

15   insofar as AMP documentation worksheets have been

16   completed or any other documentation that would in the

17   ordinary course be transmitted to headquarters as part

18   of a completed AMP that the area was recommending,

19   insofar as any of that has been completed in any of

20   these six that have been terminated, we request that

21   copies of those documents be produced for examination

22   so we can ascertain whether it may provide useful

23   insights into why these studies sometimes show that

24   they don't work.

25        We've been told in testimony today that the

Heritage Reporting Corporation
(202) 628-4888

524

1    ten submitted to the Commission were selected because

2    they had no negative service impacts.  These

3    apparently, among other things, had transportation

4    problems, negative service problems and volume

5    problems.  It would be a very interesting contrast to

6    the ten that the Commission has before it and we think

7    these are highly relevant.

8         I'm sorry.  I'm been reminded that actually

9    our motion to compel production of the documents in

10   these cases was granted on ten assumption that they'd

11   been completed, but the Postal Service responded that

12   they hadn't been completed, they'd been terminated, so

13   therefore they declined to produce the documentation

14   we were looking for.  So I'm revising my request to

15   say can we have the documentation from the terminated

16   as opposed to ten completed AMPs.

17        MR. TIDWELL:  First, we don't know what the

18   field has created in conjunction with the analysis

19   they may have performed.  The Postal Service was

20   hoping to receive those documents very shortly to

21   examine them.  The Postal Service is concerned about

22   disclosure of documents that may in various forms be

23   pre-decisional, that may be incomplete, that may

24   reflect work that was started but never completed in

25   different contexts meaning different things, but work

Heritage Reporting Corporation
(202) 628-4888

1    that was never finished.

2            We don't know what states the documents may

3    exist in.  We would object to disclosure of documents

4    that are pre-decisional in nature and that were not

5    relied upon in making the determination.

6            The witness has identified issues that

7    apparently led to the termination of studies.  We

8    would be willing to provide documents that were

9    relevant to those reasons that led to those

10   determinations. To the extent that they may have

11   conducted analysis that went beyond those reasons they

12   would seem to be irrelevant to the decision to

13   terminate.

14           MR. ANDERSON:  Mr. Presiding Officer, I

15   cannot think of any sense in which these documents are

16   pre-decisional.  They've been ten basis of the

17   decision.

18           We've been advised by ten Postal Service in

19   responding to our interrogatory requesting them to

20   produce these documents that the studies were

21   terminated.  So these are documents from files of

22   terminated studies and they're clearly discoverable,

23   clearly relevant.  If the Postal Service wants to

24   submit them under seal we'll take a look at them that

25   way and then we can argue about whether they ought to

526

1    be made public, but the notion that they are in any

2    sense privileged or pre-decisional is simply

3    inaccurate.

4        MR. TIDWELL:  What we would be willing to

5    provide are documents relevant to the reasons for the

6    termination.  If the determination constitutes a

7    decision then we'd be wiling to provide documents

8    pertinent to that decision.  If there was other

9    analysis irrelevant to the decision, irrelevant to the

10   reasons for the termination about analysis on other

11   issues that was never concluded, we would object to

12   that as being pre-decisional and outside the scope of

13   ten termination decision.

14       MR. ANDERSON:  May I respond, sir?

15       VICE CHAIRMAN TISDALE:  I think the idea

16   that these are irrelevant is wrong and the full

17   information should, whatever was developed should be

18   produced.  So once you get those documents, can you

19   produce those?

20       MR. TIDWELL:  We can.  I would advise that

21   they would be subject, I assume there could be some

22   AMP worksheet documents of the sort that ordinarily we

23   would make redactions for.

24       MR. ANDERSON:  We have no objection to --

25       MR. TIDWELL:  -- information.

Heritage Reporting Corporation
(202) 628-4888

527

1          MR. ANDERSON:  -- type of redactions they'd

2     make in the worksheets that were provided --

3          MR. TIDWELL:  We may have to file parallel

4     copies.  One clean and one redacted.

5          CHAIRMAN OMAS:  Mr. Tidwell, I think if the

6     documents exist, whether they be given to us in a

7     redacted state or whatever, I think they should be

8     presented to the Commission if they exist.

9          MR. TIDWELL:  We have made a request and we

10    will see what exists and see what comes in.

11         CHAIRMAN OMAS:  I would appreciate an answer

12    tomorrow, whether or not we'll get this.

13         MR. TIDWELL:  We will provide an answer

14    tomorrow.

15         VICE CHAIRMAN TISDALE:  Thank you.

16         BY MR. ANDERSON:

17    Q    Mr. Williams, may I ask you to refer to APW-

18    USPS-T-2-13(a) and (b).

19         (Pause).

20    Q    Do yo have it, sir?

21    A    T-2-13(a) and (b)?

22    Q    Yes.  In that interrogatory response you

23    indicated that processes were being developed to

24    provide the public an opportunity to comment prior to

25    a decision to undertake a feasibility study and prior

528

1    to any decision to consolidate pursuant to a

2    feasibility study.  I'm only stating what seems clear

3    on the face of your answer there.  Is that a fair

4    summary?

5        A    I'm sorry.  Could you repeat that?

6        Q    Yes.  I think you were saying that processes

7    were being developed so that the public would have an

8    opportunity to comment before a decision to undertake

9    a feasibility study.

10       A    Cr?

11       Q    I'm looking at (a).  We asked, "At any point

12   prior to the decision to undertake a feasibility study

13   or while the study is underway is the public invited

14   to comment on the proposed study?"

15            The answer was, "While that has not been the

16   case to date, such a process is being developed."

17            I guess our interrogatory asked you a

18   compound question.  Maybe that's our problem.

19            Were you developing a process to permit

20   comment prior to the decision to undertake a

21   feasibility study?  I gather not.

22       A    I'm sorry.  Could you repeat that question?

23       Q    It's almost 4:00 o'clock.  It's that time of

24   day when all this becomes really hard.

25            (Laughter).

Heritage Reporting Corporation
(202) 628-4888

529

1    Q    Was it the intention of the Postal Service

2    to permit comment before a feasibility study is

3    undertaken?  By the public?

4    A    Before a feasibility, no.

5    Q    But during the study as I understand  your

6    answer to (a) apparently was intended to mean, that

7    the Postal Service was developing a process so the

8    public could have an opportunity to comment while the

9    study is under way, is that correct?

10   A    Prior to a final decision.

11   Q    So really (a) and (b) are the same answer.

12   It really meant sometime from the initiation of the

13   process and prior to the finalization.

14   A    Before finalization.

15   Q    Okay.  We've since received ten library

16   reference N2006-1/12 dated June 6, 2006 which is ten

17   AMP notification tool kit.  Do yo have that before

18   you, sir?

19   A    Yes, I do.

20       MR. ANDERSON:  I'd like to distribute

21   copies, if I may.

22       (Pause).

23       BY MR. ANDERSON:

24   Q    Mr. Williams, did you have a role in

25   developing this notification tool kit?

Heritage Reporting Corporation
(202) 628-4888

1      A     In some parts, yes.

2      Q     What was your role?

3      A     I reviewed the earlier versions, the notice

4   of intent, and the announcement day notification.

5      Q     The early versions of ten tool kit, the

6   whole tool kit?

7      A     That's correct.

8      Q     Was your approval required for this?

9      A     No, it was not.

10     Q     Is this library reference tool kit, would

11  you have had a chance to look through this tool kit?

12  Are you familiar with it?

13     A     I am familiar with it.

14     Q     This is the current document, is it not?

15  The Area Mail Processing notification tool kit?

16     A     I believe it is, yes.

17     Q     Is there any doubt in your mind?

18     A     I have not seen a later version than 2006 of

19  May.

20     Q     So this is certainly the authentic document

21  as of that date, is that correct?

22     A     That's correct.

23     Q     This is a document where those communication

24  processes are published, is that right?  The ones that

25  you said were under development in your interrogatory

531

1    response?

2        A    Yes.

3        Q    Would you direct your attention to page 16?

4             That would appear to be a form letter used

5    in communicating to Members of Congress quite

6    obviously, correct?

7        A    Yes.

8        Q    Just reading that short form letter, I'm not

9    asking you to read it out loud, but I'm reading it and

10   you're reading it and hopefully the Commissioners are

11   too, it seems to say that the study has been submitted

12   to postal headquarters to begin the review process.

13            Now it's my understanding that that occurs

14   after the Area Vice President has decided that the AMP

15   should go forward and is recommending it to

16   headquarters for review, isn't that correct?

17       A    That is correct.

18       Q    The next paragraph attaches a copy of the

19   study brief and states, "We welcome public comment on

20   the study and will hold a public meeting on a

21   particular date at a particular location."

22            It's my understanding that that is ten point

23   at which the public is invited to participate in this

24   process, is that correct?

25       A    The point in time that the public is invited

Heritage Reporting Corporation
(202) 628-4888

532

1       to participate in the process is after ten

2       headquarters functional review has reviewed ten AMP

3       package, prior to that AMP package being submitted to

4       the Senior Vice President of Operations for a

5       decision, then the public input meeting is scheduled.

6           Q    This letter doesn't make reference to the

7       fact that it's already been approved and then

8       forwarded to the Senior Vice President.  This says

9       it's been sent to headquarters.

10          A    At this point the package has not been sent

11      to the Senior Vice President of Operations at

12      headquarters.

13          Q    Right.  So then maybe you misspoke a moment

14      ago.  You said that the public input process occurred

15      after it had been sent to the Senior Vice President,

16      or did you mean to say it was before --

17          A    It was before.

18          Q    Okay, maybe I misheard you.  Thank you.

19              Let me, if I may, direct your attention to a

20      different library reference which is library reference

21      N2006-1/5.  These are ten redacted copies of the ten

22      AMP decision packages that were submitted to the

23      Commission.

24              MR. ANDERSON:  I've actually prepared an

25      excerpt from that.  Ms. Wood will provide those,

Heritage Reporting Corporation
(202) 628-4888

533

1    including one for the witness please, so we can all be

2    working from the same document.

3                We have with us in the hearing room one copy

4    of the entire document if anybody wishes to see it or

5    inspect it.  It's 188 pages long.  So out of concerns

6    for the environment if nothing else, and our mental

7    health, I've made an excerpt.

8                BY MR. ANDERSON:

9        Q    Some of these documents, as I understand it,

10   are form documents and will be the same with all ten,

11   so I just extracted.  I'd direct your attention to the

12   second page, this is page two.  These are paginated

13   with stamps at the lower right hand corner.  It's a

14   188 page document.  It's page two of that document

15   which is a letter from the Vice President for the

16   Pacific area to Mr. Paul Vogle, the Vice President for

17   Network Operations Management at headquarters.

18               If I can have your confirmation for the

19   record, Mr. Williams, that this is the standard

20   transmittal letter that is used to transmit an AMP

21   study to headquarters that the Area Vice President has

22   decided should be forwarded?

23       A    That is incorrect, actually.  We don't have

24   a standard letter to submit packages from the area to

25   headquarters, but this letter should have gone to the

534

1    Senior Vice President of Operations.

2        Q    Perhaps because of this letter I

3    misunderstood. I thought when an Area Vice President

4    refers a study to headquarters for approval that it

5    would go first through Mr. Vogle and then it would

6    require his approval to then be advanced to ten Senior

7    Vice President, but I gather that's incorrect.

8        A    It goes to the Senior Vice President of

9    Operations who sends it to the Vice President of

10   Network Operations who sends it to me.

11       Q    So this is a breach of protocol, but it

12   should have been addressed to ten Senior Vice

13   President, but he would then send it downstairs, if

14   you'll pardon the expression, not very far downstairs,

15   pretty high level.

16       A    And that was the whole purpose of having the

17   ten AMPs because we hadn't done AMPs in a while.  We

18   had many people out there in the field who had never

19   completed AMP packages and that was the purpose, to

20   identify these issues around following the process.

21       Q    If this is the worst mistake they make, they

22   did really well.

23            Okay, but this is the letter, nevertheless,

24   that would be ten point in time, if you'll pardon ten

25   use of that phrase, at which the Congress people would

535

1      have been notified in the previous exhibit we were

2      looking at to say this thing has been sent to

3      headquarters, now it's time for public input?

4           A    Once this letter hits my office I send the

5      AMP package to ten functional offices that I described

6      in the form letter.  Those functional offices review

7      the package.  There's an interactive process between

8      the AMP coordinator at the area office and my office

9      to resolve issues with the package.

10          Then once the package has gone through that

11     process, before the package gets presented to the

12     Senior Vice President of Operations for his decision,

13     then we initiative the public input process meeting.

14          Q    This is after the cross-functional review at

15     headquarters.

16          A    Correct.

17          Q    I see.

18          Would you look at page three, please, of the

19     same excerpt.  This I'm taking as an article of faith

20     is a form.  Am I correct, this is one of the

21     worksheets that's standard in the AMP, worksheet one?

22          A    Worksheet one, the approvals.

23          Q    It appears that on this particular worksheet

24     for Pasadena and Santa Clarita, five managers at the

25     district level and below had signed off on June 24,

Heritage Reporting Corporation
(202) 628-4888

536

1   2005, correct?

2        A    Correct.

3        Q    Then the Vice President for Area Operations

4   signed off on July 22, 2005.

5        A    Correct.

6             COMMISSIONER GOLDWAY:  Can I interrupt?

7   This isn't signed because two of the signatures are

8   the same.  Two different --

9             MR. ANDERSON:  Wow, somebody's wearing two

10  hats.

11            THE WITNESS:  Senior Plant Manager.

12            MR. ANDERSON:  Oh, I see.  Same name and

13  same signature.  Thank you.  Yes.  So four people had

14  signed off on it there.

15            COMMISSIONER GOLDWAY:  Three people.

16            MR. ANDERSON:  Three, excuse me.

17            BY MR. ANDERSON:

18       Q    The three managers below the Area Operations

19  Vice President and the Area Operations Vice President.

20  The Area Operations Vice President signed off on it,

21  I'm sure not coincidentally, on the same date as his

22  letter to Vice President Vogle.  I'm just observing

23  for the record because, I know I'm sounding like I'm

24  belaboring a minor point here, but I want to be very

25  clear what the steps are in the process.  I thank you

537

1    for your explanation of the cross-functional review

2    that occurs there at that point in the process.

3            The point I was driving at, and I'd just

4    like you to confirm this.  What seems to be obvious

5    from this is that there were, the managers at the

6    district and plant level approved the AMP after all

7    these worksheets had been completed, referred it to

8    the Area Vice President who reviewed it or had his

9    staff review it for him, he approved it and he

10   forwarded it to headquarters and it was subject to a

11   cross-functional review by all those managers you

12   mentioned, and then the decision was made to forward

13   it to the Senior Vice President for Operations for the

14   Postal Service.

15       A    Correct.

16       Q    It was at that point that the public input

17   process is to be initiated, as I understand it.

18       A    The public input process was defined after

19   the first ten AMPs.  The public input process was not

20   defined until earlier this year.

21       Q    Right, but --

22       A    We would not have subjected this AMP to that

23   process.

24       Q    Okay, but that's the point at which it

25   gets --

538

1          COMMISSIONER GOLDWAY:  It didn't in the past

2    but it will in the future.

3          THE WITNESS:  That is correct.

4          BY MR. ANDERSON:

5     Q    The point I was also bringing out is that at

6    this point four managers in the field, including an

7    Area Vice President, and probably even more managers

8    than that at headquarters had reviewed this AMP and

9    concluded that it had merit and sent it forward to the

10   Senior Vice President.

11    A    Correct.

12    Q    So if the public input process that begins

13   then is going to have any impact, it has to undo a

14   decision and a recommendation that bears the signature

15   and the reputations of all these managers.  I would

16   submit that that is not something that most managers

17   in my experience are wont to do, which is to change

18   their minds once they've made a recommendation to

19   somebody that outranks them by several levels in the

20   postal hierarchy.

21          MR. ANDERSON:  I withdraw the question.

22          BY MR. ANDERSON:

23    Q    Please refer, sir, to APW-USPS-T-2-15(d).

24          Have you gotten there, Mr. Williams?

25    A    I'm reading it.

539

1          Q     Okay.

2                (Pause).

3          A     Okay.

4          Q     I believe you testified that your

5     interrogatory responses would be ten same as they were

6     here so I don't want to belabor the record

7     unnecessarily, but I just wanted to ask you to

8     juxtapose that answer with your answer to

9     APW-USPS-T-2-16(e).  Have you got your hand on both

10    now?

11         A     Yes.

12         Q     I looked from one to the other and I see

13    that 15(d) says that customer costs are not model

14    inputs for the END model.  16(e) says that the AMP

15    process is not designed to consider costs incurred by

16    mailers.  So that tells me that neither the AMP

17    process nor the END process considers customer costs

18    or mailer costs.

19         A     I am informed that the END modeling does not

20    consider customer costs.  The AMP process does not

21    consider customer costs.

22         Q     I appreciate the precision of your answer,

23    Mr. Williams.  Thank you.

24                May I ask you to go back to your list of 41

25    attached to your testimony as T-2 please.

1           I'm informed and I wonder whether you know

2    that four of the AMPs on that list of 41 have been the

3    subject of townhall meetings.  Is that correct?  I can

4    name the ones I think if your recollection is failing

5    you.

6        A    It would be Jackson, Tennessee into Memphis;

7    St. Petersburg into Tampa; Sioux City into Sioux

8    Falls; and Yakima, Washington into Pascoe, Washington.

9        Q    The same list as mine.  I just wanted to

10   confirm that the townhall meetings you had in those

11   places are the same sort of townhall meetings you'd be

12   planning to have in other locations.  Would that be

13   correct?

14       A    That is correct.

15       Q    Let me ask you to refer back to this excerpt

16   from library reference N2006 1/5, please.

17       A    The reference that you put together?

18       Q    That's right, the excerpt from that library

19   reference.

20           Please look at page 24.  Again, they're

21   numbered at the lower right hand part of the page.

22   This would be the executive summary brief from the

23   Olympia to Tacoma AMP.

24           What I'm looking for, sir, is a passage

25   there that states that adjustments to receipt and

541

1    clearance times of state agency mail, express mail

2    collection box pickup times, and associate office

3    retail hours will need to be pushed back.  This is

4    under the Voice of the Customer heading, I believe,

5    the second paragraph.

6        Beginning with the second sentence in the

7    second paragraph under the heading Voice of the

8    Customer.

9        Again, I apologize for using a silly word,

10   juxtapose, but I can't think of a better one right

11   now.  Let me ask you to juxtapose that with page 25 if

12   you would.  There's a summary there.

13       The fourth sentence of that summary is a

14   very short sentence.  It says, "There are no service

15   impacts anticipated."

16       But if you compare that to the statement on

17   page 24 which gives a litany of about four or five

18   changes that are necessitated by this AMP, I want to

19   ask you this question.  Do these kinds of changes

20   listed on page 24 not fall within the definition of

21   service or service changes?

22       A    I would agree that as described in this

23   paragraph, the second paragraph under Voice of the

24   Customer, that those would be described as service

25   standards.

1          The reference on page 25, while I don't know

2    who put this executive summary together, I would

3    suspect that what that sentence really meant to say

4    was that there are no service standard impacts

5    anticipated.

6        Q    So it means that all the mail that would

7    have a two-day commitment would keep a two-day

8    commitment.

9        A    Right.

10       Q    It's been our observation that having

11   earlier collection box pickup times and other services

12   kinds of changes of the sort noted here crop up pretty

13   frequently in these AMP changes that have been

14   undertaken.  Is that a fair summary?

15       A    That is not a fair summary.  When you say

16   frequent, it's a relative term.  There have been some

17   AMP packages.  Most AMP packages come in with no

18   changes.  Just collection box times.

19       Q    There's no form on here any place I see that

20   calls for those changes in collection box times to be

21   filled in.  There's no blank that calls for that, is

22   there?

23       A    Not specifically, no.  Not in the worksheets

24   of the PO408 AMP process.

25       Q    The focal point I think you'll agree with me

Heritage Reporting Corporation
(202) 628-4888

1    of the AMP study process, if there is one on service,

2    it's service standards meaning how many days it takes

3    to deliver first class mail, isn't that correct?

4        A    Not entirely.  I believe if you go to the

5    library reference, USPS LR N2006 1/3, the guidelines

6    of PO408, I believe there is a section in Worksheet 8.

7    This is a revised Worksheet 8 that describes customer

8    service impacts.

9        Q    Pardon me, sir.  Is this part of library

10   reference 1/5?  Or is it some other library reference?

11       A    1/3, where there is an opportunity to

12   describe in detail any downgrades to services for

13   other mail classes.

14       Q    Let me take a look, if I may.

15            (Pause).

16       Q    Sir, what are you referring to that calls

17   for a description of earlier collection times?

18       A    There's just a blank space for descriptions

19   of other customer impacts.  It's just an opportunity

20   on the worksheet to describe those impacts.  While we

21   don't have a specific place for collection box time

22   changes, there is an opportunity to describe other

23   service impacts on Worksheet 8.

24       Q    I see a heading that says "Explain in detail

25   any downgrades to services for other mail classes."

544

1    That would seem to me to be like the reference to the

2    first class service standards calling for a very

3    specific type of information, not mailbox collections.

4        A    Right.

5        Q    Then below that, customer comments.  But

6    that doesn't call for collection box times, either,

7    unless customers happen to comment on that.

8        A    That's correct.

9        Q    But the public communication process will

10   not have been begun when this form is filled out.

11       A    That's correct.  But there is an opportunity

12   to provide customer feedback once customers on

13   Worksheet 3 and the stakeholders on Worksheet 3 are

14   notified on the intent to conduct an AMP feasibility

15   study.  Certainly the impact we receive or the

16   comments we receive from those stakeholders could be

17   noted on the AMP package prior to the package being

18   submitted up to headquarters for review.

19       Q    Would it surprise you if I told you I found

20   that in three of the ten AMPs that you submitted,

21   there were service impacts of the sort that I've

22   pointed out with regard to Olympia to Tacoma, such as

23   collection box times.

24       A    Collection box time changes.

25       Q    Would that surprise you that 3/10 of them

Heritage Reporting Corporation
(202) 628-4888

545

1    had that noted on them?

2        A    Yes, it would surprise me.

3        Q    If there were others that they just didn't

4    happen to note because they didn't think to note it,

5    that would surprise you even more, I suppose, because

6    there would be more of them.

7        A    Yes.

8        Q    But you would agree with me, wouldn't you,

9    that the pattern we see in these ten AMPs, the pattern

10   of change is that collection mail that used to be

11   processed nearer where it was collected is now being

12   processed farther away from where it's collected.  Not

13   a lot farther.  Twenty miles or so.

14       A    In aggregate, yes.  You may have some

15   offices on the fringe of a service area that may be

16   closer.

17       Q    But none of the mail -- Say the

18   consolidation is from Facility A to Facility B.  None

19   of the mail from B is going back to A.  It's all going

20   from A to B, is that correct?

21       A    Say that again.

22       Q    Mail is being consolidated by being, instead

23   of being processed at Facility A, it's being processed

24   at Facility B.

25       A    Right.

546

1      Q    I inferred that the reason it was being

2   processed in Facility A in the first place is that the

3   collection boxes were closer to Facility A than they

4   are to Facility B.  Isn't that a fair assumption?

5      A    In most cases I would agree.

6      Q    In the aggregate.  That's what you meant by

7   in the aggregate.

8      A    Right.

9      Q    I'll take that as a standard for

10  communication here.

11         So on the average, the mail is being

12  transported farther for mail processing.

13     A    I would agree with that statement.

14     Q    It seems logical to me that, it wouldn't be

15  too surprising to me that they would have to pick it

16  up earlier in order to get it 20 miles down the road

17  and get it distributed and back out for delivery

18  again.  It would seem to me, I'm arguing with you,

19  sir, and if you don't want to argue you just tell me

20  no --

21     A    I would like to give you some insight.

22     Q    Please do.

23     A    Because we've got excess capacity in our

24  facilities, because we've introduced technology in the

25  form of optical character readers and very very high

Heritage Reporting Corporation
(202) 628-4888

1    speed automation, because we have the equipment that

2    provides us much greater depth of sort in our

3    distribution operations, all those technology changes

4    have decreased the cycle time, that is that time that

5    it takes to process mail.  We process mail much much

6    faster to greater depths of sort in our facilities,

7    and you couple that with the very significant

8    decreases in single piece first class mail, the fact

9    that we've got tremendous excess capacity in our

10   originating operations because our mailers are

11   dropping deeper and deeper into our system.  It's that

12   operating window that has traditionally been full of

13   mail with much slower equipment.  All those factors

14   combined have created a great opportunity to have mail

15   come in later and still allow us to get greater depth

16   of sort much quicker and to be able to meet the

17   operating plan of that facility.

18           It doesn't mean that we've got to change

19   collection box changes.  We're leveraging technology,

20   taking advantage of the excess capacity to process

21   this mail within the boundaries of the operating

22   plans.

23       Q    All those wonderful changes you described,

24   though, don't happen overnight.  At the moment in time

25   when they implement an AMP, those are all in place,

548

1    correct?  They don't just all of a sudden put the

2    machinery in there day one and day two they bring the

3    mail.

4         A    Those technology changes that I've discussed

5    have been occurring over many many many years.

6    Certainly you follow the history of ten decline in

7    first class mail since 1998, we've dropped over 11

8    billion pieces of first class single piece mail.

9    We've got a lot of excess capacity out there.  So that

10   has not occurred overnight.

11        Q    And the collection box times are established

12   for Facility A to meet Facility A's mail processing

13   needs I assume, isn't that correct?

14        A    That is correct.

15        Q    And Facility A has, presumably, its share of

16   all that high tech equipment as well, isn't that

17   correct?

18        A    Yes.

19        Q    It also seems to us that there's a pattern

20   here that, in these AMPs that we've seen, that ten

21   collection mail is being transported for processing

22   elsewhere while work-shared mail is not being

23   transported for processing elsewhere.  Does that tend

24   to be the pattern?

25        A    It's typical of the pattern if the work-

1    share is prepared for the service area for that plant

2    and its role.  So if we have a plant that has a

3    designating role and the mail is prepared, pre-sorted

4    to that service area, then yes, that mailer work-share

5    volume would stay in Plant A instead of going to Plant

6    B.

7         Q    It's also our impression that the bulk mail

8    entry units are being maintained at these plants,

9    notwithstanding ten fact that all of ten collection

10   mail is being sent elsewhere.  The BMEUs are being

11   kept there, is that correct?

12        A    That has been ten case so far.

13        Q    I was going to ask you about post

14   implementation reviews, but I think Mr. Shah testified

15   about that.

16             Generally there seems to be a dearth of

17   post-implementation reviews and I'm wondering whether

18   that process is going to be stepped up.

19        A    Absolutely it's going to be stepped up.

20   When I was appointed the Manager of Processing

21   Operations we created, we restructured my

22   organization.  That was the changes I made earlier.

23   We created a Network Alignment Implementation Group

24   and part of that group will be to ensure that the

25   post-implementation reviews go through a very rigorous

550

1    process.

2         Q    I understand that the post-implementation

3    reviews for the 2004 AMPs are at headquarters now?

4    Already been completed and are under approval at

5    headquarters?

6         A    They are undergoing cross-functional review.

7         Q    Does that process include then a report to

8    the Senior Vice President after following that review?

9         A    Yes.

10         Q    In the post-implementation review process, I

11    don't think there's any provision in that process for

12    public input, isn't that correct?

13         A    That is correct.

14              MR. ANDERSON:   I don't have any other

15    questions.  Thank you very much, Mr. Williams.

16              THE WITNESS:   Thank you, Mr. Anderson.

17              VICE CHAIRMAN TISDALE:   Thank you, Mr.

18    Anderson.

19              MR. ANDERSON:   I'm sorry, Mr. Presiding

20    Officer.   I move that library reference N2006 1/5 not

21    be transcribed in the record but be deemed to be a

22    part of the record for reference by the parties in

23    their briefs to the Commission.   It was in part the

24    basis of Mr. Williams' interrogatory responses and in

25    part the basis of his testimony and I think it would