## The Service's Strategy for Realigning Its Mail Processing Infrastructure Lacks Clarity, Criteria, and Accountability

We developed criteria for evaluating the Service's strategy, including how effective it would be in eliminating excess capacity and whether the strategy was transparent and accountable. The Service's strategy raises several issues. First, the Service's strategy for realigning its mail processing and distribution infrastructure is unclear. Second, it does not include specific criteria and processes for eliminating excess capacity, including the removal of unnecessary facilities. Third, the Service's strategy excludes stakeholder input, is not sufficiently transparent and accountable, and lacks performance measures for results of decisions.

### The Service's Strategy for Realigning Its Mail Processing and Distribution Infrastructure Is Not Clear

The Service's strategy for realigning its mail processing and distribution infrastructure has not been clear because the Service has outlined several seemingly different strategies over the past 3 years. In 2002, the Service announced a strategy for realigning its infrastructure that outlined an ambitious effort to "initiate sweeping logistics changes." According to the Service, a modeling tool referred to as Network Integration and Alignment (NIA) was to be used to determine what specific changes would be made. These changes were to include consolidation of plants, redefined roles for plants, reduced transportation costs, and a streamlined network. An implementation plan for this strategy was to be developed by December 2002. However, to date the Service has not developed an implementation plan. Following a recommendation we made, in November 2003, the chairman of the Senate Committee on Governmental Affairs and a senator asked the Service to provide a plan on how it intended to optimize its infrastructure and workforce that described the criteria, process, and data the Service was using to make decisions, as well as the strategies, timing, and funding necessary.[10] In December 2003, the chairmen, and ranking minority members, of the House Committee on Government Reform and the Special Panel on Postal Reform and Oversight also asked the Postal Service to submit a plan on how it intended to fund capital investments needed to ensure the long-term viability of the Postal Service, including how the Service intended to rationalize its infrastructure and workforce. In response, in January 2004, the Service submitted to the House Committee on Government Reform, a report entitled, *Infrastructure and Workforce Rationalization: Funding Key Capital Investments*. This report, which

[10] U.S. Government Accountability Office, *Postal Pension Funding Reform: Issues Related to the Postal Service's Proposed Use of Pension Savings*, GAO-04-238 (Washington, D.C.: Nov. 26, 2003).

EXHIBIT 13 Part 2

was not made public by the Postal Service, described a "promising alternative" being considered that the Service called a consolidation hub concept. Under this concept there would be two basic types of facilities, origination and destination facilities, which would be the initial recipients of collection mail and the final plant before delivery, and consolidation hubs where the mail would be consolidated and distributed. According to the report, "the major difference between this concept and the current mail processing environment is that it envisions a single uniform network."

Since issuance of this report, Postal Service officials told us that nothing is planned across the entire network but rather opportunities will be reviewed as they arise. In a speech before the 2004 National Postal Forum[11] the Postmaster General called this strategy the Evolutionary Network Development (END) and explained it in the following manner:

> "A couple of years ago there was a lot of fanfare and misunderstanding about a concept known as "NIA" - Network Integration and Alignment. Many saw it as the ultimate plan to consolidate and close facilities. Well, it's not.
>
> "Why? Because nobody can predict 5, 10, or 15 years from now what mail volume will be, or what type of mail processing equipment we will be using to sort the mail. So we have decided, instead, to do what we've done for decades. That is, take the next step in evolving our networks, and that's our E-N-D game – short for Evolutionary Network Development.
>
> "It's an END game that never ends, because rationalizing and optimizing security, plants, processing systems, transportation, and staffing is something we have to continue to do to keep our networks efficient and our systems affordable."

Neither the Service's report, the strategy outlined in meetings with Postal Service officials, or the Postmaster General's speech sets criteria for making realignment decisions, nor do they include a process for making these decisions. In addition, no details about the Service's vision of how its planned changes will remove excess capacity in the network, minimize productivity variances, maximize overall efficiency, or how much the Service will save in costs has been provided. The Service has procedures that it uses when making decisions to consolidate operations in its mail processing plants, which are outlined in appendix N of the Transformation Plan. These procedures include a feasibility study, preparation of proposal documentation, an approval process, and implementation steps. However, in discussions with Service officials, we were given vague and confusing

[11] PMG Jack Potter's speech at the 2004 National Postal Forum.

information on the Service's procedures for closing plants. Consequently, it is not clear how these procedures relate to the Service's realignment strategy, whether these procedures are used when closing plants, are applicable to all plants, or if these procedures are used consistently. In addition, the procedures outlined in appendix N lack specificity regarding

- who is responsible for initiating proposals,
- who conducts feasibility studies and how,
- what criteria are used to evaluate proposals,
- who is responsible for approving these proposals,
- how these proposals are implemented, and
- who is held accountable for these decisions.

It is also unclear how stakeholders are notified, when they are notified, and by whom.

## In Attempting to Evaluate the Service's Strategy We Developed Criteria

In evaluating the Postal Service's strategy, we established criteria based on the Service's stated goals for realignment, our previous work, the Committee on Government Reform report that accompanied House postal reform legislation (House Report), the Committee on Governmental Affairs report that accompanied Senate postal reform legislation (Senate Report), and the President's Commission on the United States Postal Service (Commission) report.[12] In its Transformation Plan the Service stated, "the mail processing network infrastructure will be redesigned to meet volume forecasts, customer requirements, and competitive pressures. Streamlining and simplifying the distribution network will permit consolidation of sorting facilities and elimination of excess resources." In our previous work, we emphasized the importance of transparency and accountability

[12]*House Report Part 1 - Postal Accountability and Enhancement Act 29-006*, Report 108-672, 108th Congress (Washington, D.C.: September 8, 2004). *Report of the Committee on Governmental Affairs, United States Senate, Postal Accountability and Enhancement Act Report* 108-318, 108th Congress (Washington, D.C.: August 25, 2004). President's Commission on the United States Postal Service, *Embracing the Future: Making the Tough Choices to Preserve Universal Mail Service* (Washington, D.C.: July 31, 2003).

for government institutions such as the Postal Service.[13] Both the House and the Senate Reports also state the importance of transparency to the Service achieving its realignment goals. In previous testimony, we stated that in order to be successful in its realignment the Service will need the input and support of its major stakeholders, such as mailers, employees, communities, and government representatives.[14] The Commission has stated that it is important for the Service to ensure that an appropriate process for soliciting and dealing with stakeholder concerns is implemented. The Service identified one of the benefits of realignment as reduced total costs for the Service and mailers. Accordingly, in evaluating the Service's strategy for realigning its infrastructure, we used the following criteria:

1. Will the Service's strategy result in a network that is efficient and flexible, and will it lead to the elimination of excess capacity?

2. Does the Service's strategy include stakeholder input, and is it transparent and accountable under the following guiding principles;

- It is based on a clear, transparent, and consistently applied process.

- It ensures that when decisions are made they are conducted as fairly, effectively, and efficiently as possible.

- It provides for accountability in connection with decisions.

## The Service's Strategy May Not Reduce Excess Capacity and Is Not Transparent and Accountable

It is unclear how the Service's strategy will result in elimination of excess capacity because it does not include criteria for making realignment decisions that include considering the effect on excess capacity, nor does it include performance measures related to eliminating excess capacity. In addition, the Service's strategy excludes stakeholder input and is not sufficiently transparent or accountable. The strategy does not include criteria for making decisions or processes for implementing decisions,

[13]U.S. Government Accountability Office, *U.S. Postal Service: Transformation Challenges Present Significant Risks*, GAO-01-598T (Washington, D.C.: April 4, 2001). U.S. Government Accountability Office, *U.S. Postal Service: Bold Action Needed to Continue Progress on Postal Transformation*, GAO-04-108T (Washington, D.C.: November 5, 2003).

[14]GAO-04-108T.

which would help ensure fairness and effectiveness, nor does it include performance measures for evaluating decisions.

### The Service's Strategy May Not Result in Elimination of Excess Capacity

In discussions with Service officials, we were told that the closing of the Marina Del Rey processing plant was a good example of the Service's strategy. The Service will close the Marina Del Rey plant and move operations into its South Los Angeles plant. The Marina Del Rey plant had productivity in fiscal year 2004 of 1,598 pieces per hour, while the Los Angeles plant had productivity of 1,139 pieces per hour. According to Service officials, none of the 900 employees at the Marina Del Rey plant will lose their jobs. Instead they will be relocated. The Service has also stated that it has no immediate plans for the building once the operations are moved out of it. It is not clear how closing this plant will increase efficiency or reduce excess capacity. Criteria for making realignment decisions would help clarify the Service's decisions.

As stated earlier, the Service has also been consolidating shifts across its infrastructure. These consolidations have contributed to the Service's impressive reduction in workhours over the past 3 years. However, consolidating shifts may lead to excess capacity in other areas. For example, if mail is no longer processed on certain shifts this means that the processing equipment sits idle during that shift. In addition, if several plants in a particular area have eliminated processing shifts it may be feasible to consolidate these plants and dispose of excess physical infrastructure. Due to the Service's lack of transparency about the results of its network modeling activities, however, it is difficult to assess the extent of opportunities for eliminating unnecessary plants. The Service's strategy of taking advantage of opportunities as they arise may not result in consolidations or closings in the areas with the most excess capacity. Having realignment criteria that outlines at what point an area should begin closing plants may result in better alignment of resources with mail volumes.

In addition, the Service's approach of taking advantage of opportunities as they arise may prolong inefficiencies and may not address the most pressing needs. For example, the Service has been deploying automation equipment throughout its network although some of the plants that are receiving equipment may ultimately be closed, which would necessitate moving or disposing of the equipment. Similarly, equipment and transportation costs will be higher than necessary if the network is not as streamlined and simplified as it could be. Furthermore, maintaining an infrastructure that is larger than necessary requires the Service to spend

resources that it could employ elsewhere. In addition, the Service may be forgoing revenue from the sale of excess properties.

## The Service's Strategy Excludes Stakeholder Input and Is Not Sufficiently Transparent or Accountable

The Service strategy excludes stakeholder input and is not sufficiently transparent or accountable because it is not based on a clear, transparent and consistently applied process; it is not clear that when realignment decisions are made they are conducted as fairly, effectively, and efficiently as possible; and it does not have performance measures for results to provide accountability in connection with realignment decisions. To achieve its realignment goals of an efficient and flexible network, the Postal Service will have to have a strategy that is both transparent and accountable. According to the Committee on Governmental Affairs report that accompanied the Senate postal reform legislation in 2004, "it is vitally important that the Postal Service go about its facilities realignment in the most transparent manner possible. Transparency will [sic] make it possible for those affected by the Postal Service's actions to see the connection between those actions and the need to preserve the vital services the Postal Service provides."[15]

The Service's lack of external communication excludes stakeholder input that could prove valuable in developing a least-cost network for the entire mailing industry. Some stakeholders have complained that the Service does not consult with them during planning, but only communicates when it has already made its decisions. Mailers explained that this approach often leads to uncertainty and lower investment in the mailing industry. For example, one representative of a large mailing company told us that uncertainty about what the Service is planning to do about new discounts, and new processing operations, stifles this mailer's investment in its own infrastructure. Union representatives also expressed concerns about limited information related to the Service's realignment plans and how these plans might affect postal employees.

The Service has stated that it is reluctant to publicly disclose information on its realignment strategy because it believes that it will meet with resistance from employees, communities, and government representatives if it tells them what it is planning on doing too far in advance. While employees and communities may resist changes that affect them, congressional staff members have told us that Members of Congress would be better prepared to respond to constituent concerns that arise when the

[15]Senate Report 108-318, p. 25.

Service considers making changes to its infrastructure if the Service provided better information, such as the Service's criteria for its decisions.

To better inform stakeholders on its infrastructure realignment decisions, the Service needs to make public its decisions and the criteria used to make these decisions. There are various avenues the Service could use to inform the public of changes and limit the burden of disclosure. For example, the Service could include a list of the changes that were made to the Service's infrastructure during that year and changes that are planned for the coming year in one of its existing reports, such as the Service's annual Comprehensive Statement.

## Conclusion

The Service faces future financial challenges due to its declining First-Class Mail volume and has excess capacity in its current infrastructure that impedes efficiency gains. The Service has stated that one way to increase efficiency is to realign its processing and distribution infrastructure. However, important questions remain about how the Service intends to realign its infrastructure to meet its future needs because the Service has not provided clear public information about its planned direction for realigning its infrastructure and workforce. The Service's currently stated strategy is an evolutionary approach that prolongs inefficiencies related to excess capacity and productivity differences among plants, resulting in higher costs. The Service's lack of communication often leads to confusion among stakeholders and communities about what the Service is doing and why and excludes input that could prove valuable to developing a least-cost network across the entire mailing industry. Because the Service does not have criteria to be considered, or a process to be followed, when making realignment decisions, it is not clear that these decisions will be made in a manner that is fair to all stakeholders or that is efficient and effective. It is also not clear that the Service's strategy provides accountability for realignment decisions, because there is no process for evaluating results, no criteria for measuring results, and no stated policy for making managers accountable for decisions.

## Recommendations for Executive Action

To enhance the Service's transparency of its decisions related to realigning its infrastructure and ensure that these decisions advance the Service's realignment goals, we recommend that the Postmaster General take the following three actions:

- establish a set of criteria for evaluating realignment decisions;

- develop a mechanism for informing stakeholders as decisions are made; and

- develop a process for implementing these decisions that includes evaluating and measuring the results, as well as the actual costs and savings resulting from the decisions.

In taking these actions, the Service should reconcile any planned infrastructure realignment changes with the criteria used to make the decisions.

## Agency Comments and Our Evaluation

The U.S. Postal Service provided comments on a draft of this report in a letter from the Chief Operating Officer and Executive Vice President dated March 18, 2005. These comments are summarized below and included as appendix IV. The Service concurred with our description of its mail processing and distribution infrastructure and the major business and demographic changes that have effected the Service's operations. The Service did not comment on our conclusions or recommendations.

With respect to the Service's statement that one of the key strategies of its Transformation Plan is an initiative called Evolutionary Network Development (END), this initiative was not discussed in the Service's Transformation Plan. Instead, the Transformation Plan discussed an initiative referred to as Network Integration and Alignment (NIA), which called for analyzing and redesigning the existing network with the goal of creating a flexible logistics network and reducing overall costs for both the Service and the mailing industry as a whole. In addition, NIA was to determine which facilities would be necessary within the future infrastructure. In its January 2004 report to Congress on its infrastructure and workforce rationalization, the Service further discussed the status of NIA and said that it planned to pilot network alternatives in 2005 and if the results of the pilots were favorable, it could have a completely optimized network in place by the end of 2009. The NIA initiative appears to be more comprehensive and integrated in scope than the evolutionary approach referred to as END, which was described to us as a strategy that takes advantage of opportunities as they arise. As stated in the body of this report, the Service's strategy remains unclear because the Service has outlined seemingly different approaches to realigning its processing and distribution infrastructure.

Regarding the Service's statement that Area Mail Processing (AMP) is one of the tools it uses to implement the goals of END, we remain concerned that these goals may not be realized because it is not clear whether AMP includes criteria for making realignment decisions, and if so, what these criteria are, and that therefore the processes associated with AMP are not responsive to the recommendations we made. Furthermore, the AMP guidelines do not include determining the disposal of facilities or the reduction of excess capacity. Consequently, it is not clear how AMP directly relates to reducing excess capacity, furthers the overall redesign of the mail processing and distribution infrastructure, or relates to the Service's vision of its future infrastructure.

The Service also stated that the decisions it makes will be made with stakeholder input. However, it is not clear how stakeholder input will be incorporated into realignment decisions. As previously mentioned, congressional staff told us that Members of Congress would be better prepared to respond to constituent concerns if the Service were more transparent regarding its infrastructure decisions. Hence, we continue to believe that a formal mechanism for notifying stakeholders of realignment decisions, as we recommended, is vital.

The Service stated that because it cannot accurately predict future changes in the hard copy communications and package delivery industry, the changes it seeks to make must be incremental. However, the President's Commission pointed out in its report that regardless of the economic climate, the nation is due the most cost-effective, efficient, high-quality Postal Service that can be provided. To this end the Commission recommended that the Service accelerate its efforts to redesign the postal network. Furthermore, the Service itself stated in its Transformation Plan that this is "the ideal time to initiate sweeping logistics changes."[16] We believe that without clarity, criteria, and accountability in its realignment strategy, the Service risks falling short of achieving the major productivity gains that will be needed to offset rising costs and maintain high-quality, universal postal service at affordable rates.

As agreed, unless you announce the contents of this report earlier, we plan no further distribution until 30 days after the issue date. At that time, we

[16] U.S. Postal Service Transformation Plan, p. 30.

will send copies of this report to the Chairman and Ranking Minority Member of the House Committee on Government Reform; the Chairman and Ranking Minority Member of the Senate Committee on Homeland Security and Governmental Affairs, Senator Thomas R. Carper, the Postmaster General, and other interested parties. We will also provide copies to others on request. This report will also be available on our Web site at no charge at http://www.gao.gov.

If you have any questions regarding this report, please contact me at siggerudk@gao.gov or by telephone at (202) 512-2834. GAO contacts and acknowledgments are listed in appendix V.

Katherine Siggerud
Director, Physical Infrastructure Issues

# Objectives, Scope, and Methodology

To describe the impact of major changes on the Service's mail processing and distribution infrastructure, we discussed with Postal Service officials, mailing associations, mailers, and union representatives their views on changes that have occurred in the mailing industry and the impacts these changes have had on the Postal Service. Through our initial discussions we narrowed the focus of our objective to three major changes, (1) changes in the marketplace, (2) the evolution of mail processing and its related infrastructure, and (3) shifts in demographics and transportation modes. To gain more insight into the first change, we analyzed mail volume trends over the past 30 years and reviewed literature related to these trends, including special reports prepared for the President's Commission on the United States Postal Service, a special report prepared by Pitney Bowes for the 12th Conference on Postal Delivery and Economics, Postal Service presentations, and articles and studies prepared by mailers and mailing groups. In addition, we discussed the cause and effect of mail volume declines with Service officials. We also reviewed, analyzed, and discussed with Service officials, mailers, mailer associations, and union representatives, articles related to competition in the mailing industry and changes in the role of mailers. To further our understanding of the evolution of mail processing, we reviewed, analyzed, and discussed with Service officials, data related to the age, location, size, ownership, and equipment complement of the Service's processing and distribution infrastructure. We also reviewed literature on the history of mail processing and changes that have occurred in mail processing operations over the past century. In addition, we conducted site visits to mail processing plants in the Capital Metro, the Eastern, the Southeastern, and the Pacific areas, and discussed mail processing changes with management at these plants. We also discussed related changes with eight area vice presidents and the Manager of Capital Metro Area Operations, as well as Service officials, mailers, mailer associations, and union representatives. To assess the impact of demographic shifts, we reviewed, analyzed, and mapped geo-spatial data from the Postal Service and Census Bureau. We also reviewed related articles and Service documents. To analyze the impact of these changes, we reviewed, analyzed, and discussed with Service officials, data related to productivity and cost variances, as well as excess capacity in the Service's processing and distribution infrastructure.

To describe the actions the Service is taking to achieve a more efficient and flexible network in response to these changes, and the challenges associated with implementing these actions, we reviewed, analyzed, and discussed with Service officials the Service's Transformation Plan and related updates. We also reviewed Postal Service documents related to

operations, including Annual Reports, Comprehensive Statements, Capital Investment Plans, Investment Highlights, Five-Year Strategic Plans, Corporate Automation Plans, Integrated Plan for Operations, and documentation related to specific programs. We conducted site visits to plants in the Capital Metro, the Eastern, the Southeastern, and the Pacific areas, and discussed initiatives and programs with management at these plants. We also discussed these initiatives and programs and the challenges associated with them with eight area vice presidents and the Manager of Capital Metro Area Operations, as well as Service officials, mailers, mailer associations, and union representatives.

To discuss the issues related to the Service's strategy for realigning its infrastructure, we discussed with Service officials, including the Service's Chief Operating Officer, how the Service intended to approach realignment. We also reviewed Postal Service documents, including the Transformation Plan, Infrastructure and Workforce Realignment: Funding Key Capital Investments, and documents related to realignment. In addition, we reviewed postal reform documents, including the Committee on Government Reform report that accompanied House postal reform legislation (House Report), the Committee on Governmental Affairs report that accompanied Senate postal reform legislation (Senate Report), and the President's Commission on the United States Postal Service (Commission) report. In addition, we discussed the Service's realignment efforts with mailers, mailing organizations, and union representatives.

We used productivity and cost data provided by the Postal Service to assess the impact of changes on the mailing industry. We did some testing of the data by performing basic logic tests, reviewing all related documentation, and discussing with agency officials any apparent inconsistencies or inaccuracies we found with the data. On the basis of those discussions, we adjusted the data to ensure that the inconsistencies or inaccuracies we found were corrected or clearly explained. Based on our testing, we determined that the required data elements are sufficiently reliable for the purposes of this engagement.

We received written comments on a draft of this report from the United States Postal Service. The comments we received are discussed near the end of the letter and the written comments are included in appendix IV. We conducted our review at Service headquarters and field locations between April 2004 and January 2005 in accordance with generally accepted government auditing standards.

# Descriptions of Various Mail Flows with Diagrams

## Letter Mail Processing

There are a number of different processing operations that letter mail must undergo before arriving at its final destination. Containers of loose mail are collected from collection boxes and transported to plants that handle collection mail through a dual pass rough cull machine that separates machinable letter mail from other mail. The other mail consists of flat mail, bundles, and nonmachinable pieces that go to different mail streams for processing. Once the mail is separated, machinable letter mail is transported to an advanced facer canceller system (AFCS). The AFCS prepares letter mail for down stream automated processing by facing the mail in the proper position, canceling the postage, and separating letters into three categories. Currently, these categories include (1) handwritten address letters, (2) machine printed address letters with no barcode, and (3) machine printed address letters with a barcode. AFCS enhancements in 2005 will provide greater readability that will enable a more defined separation of the mail.

Machine printed address letters without a barcode are transported to the multiline optical character reader (MLOCR) machine where a barcode is applied to the letter piece. If the address is not readable by the MLOCR, the mailpiece is scanned and an image sent to an off-site remote encoding center (REC). There, human operators view a scanned image of the envelope, key-in the correct address information, and transmit the results back to the mail processing plant where a correct barcode is applied to the physical mailpiece on a delivery barcode sorter-output subsystem (DBCS-OSS) for continued automated processing. Handwritten mail from the AFCS is sent directly to a DBCS-OSS and images of these pieces are electronically transferred to the REC. Results from keyed information are returned to the DBCS-OSS where a barcode is applied to the letter piece and sorted to its appropriate destination. Machine printed address letters with a barcode are also sent directly to a DBCS-OSS for processing.

Once the letters have barcodes, the mail is then sorted by ZIP Code on a DBCS-OSS or a delivery barcode sorter (DBCS). Letter pieces destinating in a different location are sorted to the first 3 digits of the ZIP Code. These pieces are then ready for transport to other postal plants for further processing. Letter pieces that are destinating in the same area are sorted multiple times—this includes mail already presorted from other processing plants. These letter pieces are sorted to 5, 9, or 11 digit ZIP Code levels.

During letter processing, pieces that are nonmachinable or have nonreadable addresses will be rejected from the automated equipment and must be manually processed. Depending on where in the process the piece

is rejected, employees will try to reintroduce the mail back into automation. If the mail cannot be reintroduced into the automation process, employees will sort the mail by hand to the 3, 5, 9, or 11 digit ZIP Code level.

Besides collection mail, the mailing industry also delivers discount mail or "bulk mail" to plants for processing. To claim the lower postage rates, the mailer must have a minimum quantity and do some additional work that makes it easier for the Postal Service to handle the mail. Based on how efficiently they can be processed, mailings are classified by the way they are prepared, including machinable, nonmachinable, and automation. A single mailing usually includes multiple levels of ZIP Code sortation. Discounted letter mail will be inducted into the mail stream at the appropriate level of distribution based on mail class, preparation, and sort level. Figure 18 shows how letter mail is processed.

Appendix II
Descriptions of Various Mail Flows with Diagrams

**Figure 18: Letter Mail Processing**

Collection mail
Address data
Multiline Optical Character Reader (MLOCR)
Applies barcode to each piece
Remote Encoding Center
Image read by human
Machine printed address letters with no barcode
Handwritten address letters and machine printed address letters with barcode
Address data
Letters
Dual Pass Rough Cull
Separates letters, flats, bundles, and nonmachinable mail
Advanced Facer Canceller System (AFCS)
Delivery Bar Code Sorter-Output Sub-System (DBCS-OSS)
Applies barcode and sorts to 3 digit ZIP Code
Rejected by DBCS-OSS
Rejected by DBCS
Delivery Bar Code Sorter (DBCS)
Sorts to 5 digit ZIP Code
Manual processing
Outgoing mail
Transportation for mail destinating outside of area
Presorted 3 digit ZIP Code mail
From another postal plant
Presorted 5 digit ZIP Code mail
From mailer
Delivery Point Sequencing 1
DBCS machine performs sort to 9 digit ZIP Code (carrier route)
Delivery Point Sequencing 2
DBCS machine performs sort to 11 digit ZIP Code (walk sequence)
Outgoing local mail
Mail destinating in area ready for delivery

Source: GAO.

Page 67 GAO-05-261 U.S. Postal Service

## Flat Mail Processing

There are a number of different operations that flat mail undergoes before arriving at its final destination. Collection mail is loaded into a dual pass rough cull machine that separates flat mail from other mail. The other mail consists of letter mail, bundles, and nonmachinable pieces that go to different mail streams for processing. Once the mail is separated, employees will manually ensure that correct postage is applied and render the postage unusable—cancel—on each flat piece of mail.

Once canceled, the flat pieces are prepped to be placed on a machine for sorting. Currently, there are three different types of flat sorting machines: automated flat sorting machine (AFSM 100), upgraded flat sorting machine (UFSM 1000), and flat sorting machine (FSM 1000). Flat pieces destinating in a different location from where it originates are sorted on one of the three flat sorting machines to the first 3 digits of the ZIP Code. These pieces are then ready for transport to other postal plants for further processing. Flat pieces that are destinating in the same area will be sorted again to the 5 digit ZIP Code on one of the three flat sorting machines—this includes mail already presorted from other processing plants. The AFSM 100 and the UFSM 1000 are also used to sort flat mail to the carrier route level—9 digit ZIP Code. If the address is not readable by the AFSM 100 or the UFSM 1000, then the flat piece is scanned and an image is sent to an off-site remote encoding center (REC). There, human operators view a scanned image of the flat, key-in the correct address information, and transmit the results back to the mail processing plant where a correct barcode is applied to the flat.

Throughout flat processing, there will be mail that is rejected by the flat sorting machines or due to physical characteristics is unable to be processed on flat sorting equipment. Employees will try to reintroduce the flats that were rejected back into the machine for reprocessing. If the mail cannot be processed on the machines, employees will manually sort the mail by hand to 3, 5, or 9 digit ZIP Code levels.

Besides collection mail, the mailing industry also delivers discount mail or "bulk mail" to plants for processing. In order to claim the lower postage rates, the mailer must have a minimum quantity and do some additional work that makes it easier for the Postal Service to handle the mail. Based on how efficiently they can be processed, mailings are classified by the way they are prepared, including machinable, nonmachinable, and automation. A single mailing usually includes multiple levels of ZIP Code sortation. Discounted flat mail will be inducted into the mail stream at the

Appendix II
Descriptions of Various Mail Flows with Diagrams

appropriate level of distribution based on mail class, preparation, and sort level. Figure 19 shows how flat mail is processed.

Page 69 GAO-05-261 U.S. Postal Service

Appendix II
Descriptions of Various Mail Flows with Diagrams

**Figure 19: Flat Mail Processing**

Collection mail
Flats
Dual Pass Rough Cull
Separates letters, flats, bundles, and nonmachinable mail
Manual cancelling
Letters, bundles, and nonmachinable mail
(See figure 18)
Manual flat prep
Presorted flats
From mailer
Address data
Rejected flats
Remote Encoding Center
Image read by human
Automated Flat Sorting Machine 100/ Upgraded Flat Sorting Machine 1000 (AFSM 100/UFSM 1000)
Sorts to 3 digit ZIP Code
Flat Sorting Machine 1000 (FSM 1000)
Sorts to 3 digit ZIP Code
Rejected flats
Manual processing
Sorts to 3 digit ZIP Code
Outgoing mail
Transportation for mail destinating outside of area
Address data
Presorted 3 digit ZIP Code flats
From mailer
Presorted 3 digit ZIP Code flats
From mailer
Rejected flats
Rejected flats
AFSM 100/ UFSM 1000
Sorts to 5 digit ZIP Code and 9 digit ZIP Code (carrier route)
FSM 1000
Sorts to 5 digit ZIP Code
Manual processing
Sorts to 5 digit ZIP Code and 9 digit ZIP Code (carrier route)
Outgoing local mail
Mail destinating in area ready for delivery
Presorted 3 digit ZIP Code flats
From another postal plant
Presorted 3 digit ZIP Code flats
From another postal plant

Source: GAO.

Page 70 GAO-05-261 U.S. Postal Service

## Parcel Processing

Parcels can be processed a number of different ways depending on the mail class and size. The equipment used and the type of sortation will depend on the origin and destination of the parcel. Automation and mechanization are only available at selected postal plants.

## Parcels

Any class of parcels can be sorted on a small parcel and bundle sorter (SPBS) machine. If a parcel is destinating in a different location, then a human operator at the SPBS machine manually keys in the first 3 digits of the ZIP Code, which directs the piece to the correct destinating bin. At dispatch time, the parcels are ready for transport to the destinating postal plant for further processing. If the parcel is destinating in the same area, then the human operator at the SPBS machine manually keys in the last 3 digits of the ZIP Code, which directs the piece to the correct destinating bin. At dispatch time, the parcels are ready for transport to a local office for manual sortation to the delivery address.

The Service is also in the process of deploying the next generation of parcel sorting equipment at postal plants called the Automated Package Processing System (APPS), which will replace the SPBS machine in some larger plants. The APPS machine will not require human operators to manually key ZIP Code information for each parcel. APPS automates package processing by providing high-speed throughput, automated package induction, singulation, and optical character reader (OCR)/barcode reader (BCR) address recognition. If the OCR/BCR technology is unsuccessful, an image of the parcel will be transmitted to an off-site remote encoding center (REC), where address information will be keyed in the same matter as letter mail. APPS deployment will continue through FY 2006.

## Package Services

Package Services and presorted Standard Mail parcels from mailers are processed on a primary and secondary parcel sorter machine (PSM). A human operator will look at each parcel to locate a barcode indicating the piece's ZIP Code destination. If a parcel has a barcode, the piece will be sent on a conveyor belt through the package bar code scanner (PBCS), which will scan the barcode and directs the piece to the correct destinating location. If the parcel is destinating outside the area, then the mail will be sorted to the first 3 digits of the ZIP Code. If the parcel does not have a barcode, ZIP Code information is read by a human operator who will

manually key in the destination ZIP Code location. The PBCS will then affix a barcode to the parcel and directs it to the correct destinating location.

All parcels that are barcoded and destinating in the area can be sent through a singulate scan induction unit (SSIU) for sorting. Parcels are sent one at a time through a weigh-in-motion scale and then through a scanning tunnel that will read the 5 digit ZIP Code and direct the piece to the correct destinating bin. At dispatch time, the parcels are ready to be transported to a local office for manual sortation to the delivery address.

## Nonmachinable Parcels

A nonmachinable outside (NMO) parcel cannot be sorted by postal equipment because its size or weight exceeds machine capacity or some other aspect requires the piece to be handled manually. Examples of NMOs include tubes, tires, golf clubs, and plants. If a parcel is destinating in a different location, then the piece will be sorted to the first 3 digits of the ZIP Code. The piece is then ready for transport to other postal plants for further processing. If the piece is destinating in the same area, then it will be sorted to the 3 or 5 digit ZIP Code and transported to a local office for manual sortation to the delivery address.

Throughout parcel processing, some pieces will be rejected — barcodes are unreadable, no barcode is applied, and packages break open. These parcels will be reintroduced into the PSM for processing. If the mail cannot be reintroduced into the PSM for processing, then employees will process the mail manually to the appropriate delivery address. Figure 20 shows how parcels are processed.

Appendix II
Descriptions of Various Mail Flows with Diagrams

**Figure 20: Parcel Processing**

Nonmachinable Parcels
Manual processing
Sorts to 3 digit or 5 digit ZIP Code
Parcels
Small Parcel and Bundle Sorter (SPBS)
Manual ZIP Code keying
Sorts to first 3 digits of ZIP Code or last three digits of ZIP Code
Outgoing Mail
Transportation for mail destinating outside area
Presorted 3 digit ZIP Code parcels
From another postal plant
Manual ZIP Code keying
Package Bar Code Scanner (PBCS)
Applies barcodes to parcels
Parcels without barcodes
Rejected barcode or no barcode
Rejected
Parcels with barcodes
Package Services
Primary and Secondary Parcel Sorter Machine (PSM)
Rejected
PBCS
Scans barcode and sorts
Rejected
Singulate Scan Induction Unit (SSIU)
Scans barcode and sorts to outgoing destination ZIP Code
Outgoing Local Mail
Mail destinating in area ready for delivery
Manual Processing
Presorted 3 digit ZIP Code parcels
From another postal plant

Source: GAO.

Page 73 GAO-05-261 U.S. Postal Service

# Glossary of Postal Terms Used in this Report

| Term | Definition |
| --- | --- |
| Advanced Facer Canceller System (AFCS) | A machine that separates letter mail by address type—script, barcode, and machine imprinted—in support of the automation effort. AFCS has image lifting capability needed to support the Remote Bar Coding System. |
| Automated Flat Sorting Machine 100 (AFSM 100) | A fully automated flats sorting machine designed to streamline flats mail processing operations and at the same time significantly reduce manual processing. The AFSM 100 receives mail via automatic feeders, acquires images of script and typed mail for video encoding, and processes mail using optical character recognition technology. |
| Air Mail Center (AMC) | A postal plant at an airport that receives, distributes, and dispatches mail transported by air. |
| Automated Package Processing System (APPS) | The Service's next generation for sorting parcels and bundles of mail. The APPS will automate package processing by providing greater processing capacity through automatic package induction, singulation, and address recognition. It uses a carousel-type cross belt sorter subsystem that provides high-speed throughput. |
| Breakthrough Productivity Initiative (BPI) | A program that identifies best processing, retail, and delivery practices and uses this information to standardize operational processes. |
| Bulk Mail | Mail that is rated for postage partly by weight and partly by the number of pieces in the mailing. The term is generally used to refer to Standard Mail (A). |
| Bulk Mail Center (BMC) | A highly mechanized mail processing plant that distributes Standard Mail in piece and bulk form. |
| Business Mail Entry Unit (BMEU) | The area of a postal plant where mailers present bulk, presorted, and permit mail for acceptance. The BMEU includes dedicated platform space, office space, and a staging area on the workroom floor. |

| | |
|---|---|
| Collection Mail | Mail deposited into a collection box or lobby drop, as well as mail collected by letter carriers on their delivery rounds. |
| Computerized Forwarding System | A centralized, computerized address label-generating operation that performs address correction and forwards or returns undeliverable-as-addressed mail to customers. |
| Delivery | The act of taking mail from the post office to the customer. The mail is taken to the customer's business or residential delivery address or picked up at a post office – whether post office box, window, or dock. |
| Delivery Bar Code Sorter (DBCS) | This machine is used for processing letters that are already barcoded. DBCSs come in multiple configurations; most machines have between 190 and 220 sortation bins. The DBCS is used for outgoing processing, incoming primary sortation, and Delivery Point Sequencing (DPS). |
| Delivery Point Sequencing | The process of arranging mail in delivery order for a particular carrier route. |
| Delivery Unit | A post office, post office station, or post office branch that has mail delivery functions. |
| Destinating Mail | Incoming mail arriving for its point of final delivery. |
| Destination Delivery Unit (DDU) | A customer service unit that processes mail for one or multiple ZIP codes within its own associate office. The DDU may contain a limited amount of automation equipment. The DDU generally provides mail delivery, bulk mail acceptance, and performs actions related to all products and services offered. |

| | |
|---|---|
| Detached Mail Unit | An area in a mailer's plant where postal employees perform mail verification, acceptance, dispatch, and other postal functions. |
| Dropshipping | Typically the movement of a mailer's product on private (nonpostal) transportation from the point of production to a postal plant located closer to the destination of that product. |
| Dull Pass Rough Cull | This machine separates machinable mail into different mail streams. |
| Express Mail | A mail class that provides expedited delivery service for mailable matter subject to certain standards. It is available in five basic domestic service offerings (Same Day Airport Service, Custom Designed Service, Next Day Service, Second Day Service, and Military Service). Express Mail International Service is available between the United States and most foreign countries. Express Mail is a Service trademark. |
| First-Class Mail | A class of mail that includes all matter wholly or partly in writing or typewriting, all actual and personal correspondence, all bills and statements of account, and all matter sealed or otherwise closed against inspection. First-Class Mail comprises three subclasses: postcards, letters and sealed parcels, and Priority Mail. Any mailable matter may be sent as First-Class Mail. First-Class Mail is a Postal Service trademark. |
| Flat | A mailpiece that exceeds one of the dimensions for letter-size mail (11-1/2 inches long, 6-1/8 inches high, 1/4 inch thick) but that does not exceed the maximum dimension for the mail processing category (15 inches long, 12 inches high, 3/4 inch thick). Dimensions are different for automation rate flat-size mail eligibility. Flat-size mail may be unwrapped, sleeved, wrapped, or enveloped. |
| Flat Sorting Machine (FSM) | A machine that mechanically sorts flats by ZIP Code. |

| Term | Definition |
|---|---|
| Hub and Spoke Program (HASP) | For surface mail, primarily for 2-day committed mail. HASP includes a central point ("hub") where mail for a group of offices ("spokes") can be unloaded from a series of incoming trips, massed according to their intended destination, and then sent on to that destination on another trip. Savings are realized because each trip does not have to drive to each individual office or spoke to drop off just a portion of its total load capacity. |
| Letter | A mail processing category of mailpieces, including cards, that do not exceed any of the dimensions for letter-size mail (that is, 11-1/2 inches long, 6-1/8 inches high, 1/4 inch thick). |
| Letter Sorting Machine | A large mechanized machine that can sort letters into as many as 277 bins. Operators physically read the address and then manually enter an extraction code, via keyboard, based on their memory of the sort scheme loaded into the machine's computer software. |
| Low Cost Tray Sorter | A tray sorter used for inbound tray sorting operations and outbound dispatch operations to reduce material handling workhours. |
| Mailer | An entity that prepares and/or presents a mailing to the Postal Service. In some cases, a mailer is the agent for the actual owner of the mail. |
| Mailpiece | A single addressed article of mail, usually a letter, flat, card, or parcel. |
| Multiline Optical Character Reader | An optical character reader that reads and interprets more than one line of the delivery address on a mailpiece. |
| Nonmachinable Outside | A parcel or mailpiece that, because of size, weight, or other characteristic, cannot be sorted by mechanized mail processing equipment and must be handled manually. The parcel is called an outside because it cannot be placed in a sack or other mailing container. |

| | |
|---|---|
| Optical Character Reader (OCR) | An automated mail sorting machine that interprets the address information on a letter-size mailpiece and sprays the corresponding ZIP Code information onto the piece as a barcode. The OCR consists of a mail feed unit, transport unit, stacker modules, computer with a control system, video monitor, and printer. |
| Originating Mail | Outgoing mail and local mail that enter the mailstream—that is, the point of origin—for mail processing and delivery. |
| Outgoing Mail | Mail sorted within a mail processing plant that is dispatched to another plant for additional processing or delivery. |
| Package Services | A class of mail that comprises four subclasses: Bound Printed Matter, Library Mail, Parcel Post, and Media Mail. There is no minimum weight limit for Package Services. |
| Parcel | Mail that does not meet the mail processing category of letter-size mail or flat-size mail. It is usually enclosed in a mailing container such as a carton. |
| Parcel Sorting Machine (PSM) | A large machine with an input station controlled by a computer that sorts and discharges parcels from transport trays to primary and secondary positions. |
| Periodicals | A class of mail consisting of magazines, newspapers, or other publications formed of printed sheets that are issued at least 4 times a year at regular, specified intervals (frequency) from a known office of publication. Periodicals mailers must generally have a legitimate list of subscribers and requesters. |
| Postal Automated Redirection System | A system designed to intercept and process undeliverable-as-addressed mail using automated techniques. |

| | |
|---|---|
| Presorted Mail | A form of mail preparation, required to bypass certain postal operations, in which the mailer groups pieces in a mailing by ZIP Code or by carrier route or carrier walk sequence – or other Postal Service recommended separation. |
| Priority Mail | First-Class Mail that weighs more than 13 ounces and, at the mailer's option, any other mail matter weighing 13 ounces or less. Priority Mail provides expedited delivery. Any mailable matter may be sent as Priority Mail. Priority Mail is a Postal Service trademark. |
| Priority Mail Processing Center (PMPC) | The core function of a Priority Mail Processing Center is to provide an operational foundation capable of delivering consistent and reliable Priority Mail service. |
| Processing and Distribution Center (P&DC) | A central mail plant that processes and dispatches part or all of both incoming and outgoing mail for a designated service area. It also provides instructions on the preparation of collection mail, dispatch schedules, and sorting plan requirements to mailers. The plant is usually a sectional center plant or a general mail plant, but it can also be a dedicated mail processing plant without a station or branch. |
| Remote Encoding Center | A Postal Service unit that uses advanced technology to assign barcodes to hand-addressed mailpieces physically located at a general mail plant. After the mailpiece image is displayed on a computer terminal, an operator, who is at the center, keys in the ZIP Code and the street address in order to match this information with that in a database. This allows for the imprinting of the barcode and automated mail processing at the general mail plant. |
| Sack | A container generally used to transport flat-size mail, parcels, and loose pack mail. It is made of sewn fabric (usually nylon, polyester, canvas, or plastic with an opening at one end) and is closed with a draw cord and fastener. |

| Term | Definition |
| --- | --- |
| Sack Sorting Machine (SSM) | A mechanized, operator-controlled machine similar to a parcel sorting machine but of heavier construction, that sorts sacks of mail. |
| Service Standards | A stated goal for service achievement for each mail class. |
| Small Parcel and Bundle Sorter | A modular machine that sorts small parcels and packages or bundles of letters and flats to 100 specific bins for either delivery or processing. |
| Singulator Scan Induction Unit (SSIU) | Equipment that automates the entry of barcoded parcels onto the secondary parcel sorting machines at bulk mail centers. Packages first enter a singulator area where they are aligned in single file and spaced, and then sent through a dimensioning unit, which measures external dimensions and weight. Next, parcels pass through an omni scan tunnel where their barcodes are read. Finally, the parcel is inducted onto the parcel sorting machine. |
| Standard Mail | A class of mail consisting of mailable matter that is not required to be mailed as First-Class Mail or is not mailed as Periodicals. |
| Tray | A container used in postal plants to hold letters and First-Class Mail flats. It is used as a basic unit of mail quantity for purposes of preparing mail to qualify for discounted postage rates. |
| Tray Management System (TMS) | TMS uses tray identification, transport, storage, and process control technologies to automate the movement and staging of trayed letter and flat mail between most mail sortation operations. |
| Walk Sequence | The order in which a carrier delivers mail for a route. This order is required for most carrier route presort mail. |

**Undeliverable-As-Addressed (UAA)** — Mail that the Postal Service cannot deliver as addressed and must forward to the addressee, return to the sender, or send to a mail recovery center.

**Universal Transport System** — A system that has the ability to process letter trays, flat tubs, sacks, parcels, and bundles.

# Comments from the U.S. Postal Service

PATRICK R. DONAHOE
CHIEF OPERATING OFFICER
AND EXECUTIVE VICE PRESIDENT

UNITED STATES
POSTAL SERVICE

March 18, 2005

Ms. Katherine A. Siggerud
Director, Physical Infrastructure Issues
United States Government Accountability Office
Washington, DC 20548-0001

Dear Ms. Siggerud:

Thank you for providing the U.S. Postal Service with the opportunity to review and comment on the draft report titled U.S Postal Service: The Service's Strategy for Realigning its Mail Processing Infrastructure Lacks Clarity, Criteria, and Accountability.

As your draft report demonstrates, our nationwide mail processing, transportation and distribution infrastructure is highly complex and inter-connected, with over 450 facilities that process and transport an average of 660 million pieces of mail each day to our customers.

Our infrastructure is dynamic, with processing facilities and transportation links added or removed as needs dictate. Throughout our nation's history, our mail delivery system has changed as the country's mail needs have changed. And today we must continue making changes to the system to accommodate (1) demographic shifts within and between sections of the country, and absolute population and household growth in most sections; (2) a changing mail mix, with an increasing volume of lower margin mail classes and a decreasing volume of higher margin First-Class Mail; (3) the replacement of labor-intensive manual mail processing operations with automation that is less labor-dependent; and (4) the challenges of replacing aging and no longer optimally located facilities.

However, the reason underlying all the changes to the system, both historic and present-day, has remained the same: to ensure that the Postal Service continues to deliver on the universal service commitment the American public has come to expect, while providing other essential mail services and related products at a reasonable price. To do that, our processing network has to be efficient and affordable. We are pursuing efficiencies and cost reductions by continuing to rationalize our networks. This process is a continuation of our strategic efforts over the past several years to improve service while controlling costs in our core functional areas–retail and delivery, processing and distribution, transportation, and administrative support operations.

We are making great strides in both service improvement and cost control. In fiscal year 2004, on-time delivery of First-Class Mail reached a record 95 percent, and 93 percent of our residential customers rated our service as good to excellent. We achieved a record fifth straight year of increased total factor productivity, with staffing down to pre-1985 levels. Since 2000 we have achieved $8.8 billion in cost reductions and avoidances—all this while maintaining a residential and business delivery network that serves 114 million homes and 9 million businesses and that has been expanding at the rate of around 1.8 million new delivery points each year.

The single biggest contributor to the achievement of our *Transformation Plan* savings targets has been the reduction in workhours. Over the past two fiscal years, we have eliminated 75 million workhours, with about half of that reduction coming from streamlining and standardizing mail processing operations. These workhour reductions have produced dramatic results; for example, productivity in the mail processing function has achieved an average six percent improvement each year for the past four years.

475 L'ENFANT PLAZA SW
WASHINGTON DC 20260-0080
www.usps.com

- 2-

We are making significant progress in forging better relations with our labor unions. For the first time since 1987, we have reached negotiated agreements with our four largest unions, avoiding lengthy and contentious arbitration. Another sign of the maturing relationship between management and the unions is the agreement to substitute mediation for the more adversarial fact-finding process during dispute resolution. Relations with our employees, as measured directly by annual surveys of all of our employees, show that while we have been steadily reducing total complement, employees' job satisfaction has continuously improved. Scores on employee opinion surveys are at record high levels, and three dimensions of job satisfaction are showing significant improvement: communication from supervisors to employees has improved; we are holding employees more accountable for job performance; and employees feel they are being appropriately recognized for doing their jobs well.

One of the key strategies of our *Transformation Plan* in the area of mail processing and transportation rationalization is an initiative we call Evolutionary Network Development (END). Through the continuing application of the END process, we can respond to the challenges of declining mail volumes, an aging processing infrastructure, transportation network redundancies and operational inefficiencies to develop a flexible logistics network that reduces our costs, increases our operational efficiencies, and improves the consistency of our service. Area Mail Processing (AMP) is one of the tools we use to implement the goals of END. AMP is the consolidation of mail processing functions, typically from several facilities into one centralized facility, for the purpose of increasing operational efficiency, making better use of existing space, staffing, processing equipment, and transportation capacities while maintaining or increasing service performance to our customers. The decision to consider an AMP consolidation begins at the local management level, with input from and concern for the views, needs and wishes of stakeholders in the local business community, mailers, employees and their union representatives, and local elected officials. Each AMP proposal is tailored to best meet the various aspects of each local situation, and to generate operating efficiencies for the network as a whole. Proposals are then reviewed at the area and headquarters levels to ensure they conform to the AMP guidelines and, among other things, that any outstanding stakeholder concerns are appropriately addressed. This is a process we have been using, with refinements, for three decades, and one which has been reviewed and discussed in earlier GAO studies.

No one can accurately and reliably predict how the hard copy communications and package delivery industry will change in the next five to ten years. While some broad trends are certainly discernable, it is not possible, with the degree of specificity we would need, to say now what the optimal mail processing and delivery infrastructure should look like a decade from now. Our only recourse is to continuously examine the network for inefficiencies and redundancies, standardizing the best operational practices, and where cost-effective and operationally sensible, consolidating processing functions. The changes we seek to make, using END as a framework, must be incremental and will be made with input from stakeholders and in response to our customers' current and future needs.

If you or your staff wishes to discuss any of these comments further, I am available at your convenience.

Sincerely,

Patrick R. Donahoe

# GAO Contact and Staff Acknowledgments

## GAO Contact

Katherine Siggerud (202) 512-6570

## Staff Acknowledgments

In addition to the person named above, Teresa Anderson, Tida Barakat, Margaret Cigno, Collin Fallon, Kerry Lipsitz, Kathy Gilhooly, Brandon Haller, and Jason Kelly made key contributions to this report.

## GAO's Mission

The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability.

## Obtaining Copies of GAO Reports and Testimony

The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates."

### Order by Mail or Phone

The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:

U.S. Government Accountability Office
441 G Street NW, Room LM
Washington, D.C. 20548

To order by Phone: Voice: (202) 512-6000
TDD: (202) 512-2537
Fax: (202) 512-6061

## To Report Fraud, Waste, and Abuse in Federal Programs

Contact:

Web site: www.gao.gov/fraudnet/fraudnet.htm
E-mail: fraudnet@gao.gov
Automated answering system: (800) 424-5454 or (202) 512-7470

## Congressional Relations

Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400
U.S. Government Accountability Office, 441 G Street NW, Room 7125
Washington, D.C. 20548

## Public Affairs

Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800
U.S. Government Accountability Office, 441 G Street NW, Room 7149
Washington, D.C. 20548

PRINTED ON RECYCLED PAPER